Steven G. Storch, Esq.
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
sstorch@storchamini.com
*Attorneys for Plaintiff Oorah, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

OORAH, INC.,

                      Plaintiff,

v.

KANE KESSLER, P.C., GERARD SCHIANO-
STRAIN, ESQ., BIRCH COMMUNICATIONS
INC., RONALD KUZON and JOHN DOES 1-10,

                      Defendants.
-----------------------------------------------------------------x

Docket No. _____ CV _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiff Oorah, Inc. ("Oorah"), by its undersigned counsel, as and for its Complaint against Defendants Kane Kessler, P.C. (the "Firm"), Gerard Schiano-Strain, Esq. ("Schiano-Strain" and together with the Firm, "Kane Kessler"), Birch Communications, Inc. ("Birch"), Ronald Kuzon ("Kuzon"), and John Does 1 through 10 (Kane Kessler, Birch and the John Does, collectively, the "Defendants"), alleges as follows:

<u>**Nature of the Action**</u>

       1.     This is a diversity action brought against the parties who conspired to delay a lawsuit while denuding the defendant of all assets and records before the plaintiff was able to obtain a judgment against it, and who created fictitious invoices to obtain an undeserved judgment in the defendant's favor. Kane Kessler was litigation counsel in the lawsuit representing both the defendant transferor and the defendant transferee of the assets and it facilitated the fraudulent

scheme though numerous misrepresentations and actionable omissions to both the Court and Oorah during the course of the lawsuit. Birch was a recipient of fraudulently conveyed assets and, according to Kane Kessler's other defendant client, was responsible for destroying relevant electronic files even while their joint attorneys, Kane Kessler, were assuring the Court that all responsive documents had been produced.  Kuzon was the General Counsel of the defendant transferor and he, too, engaged in falsifying documents and the other misconduct alleged herein. Finally, the "John Doe" defendants are individuals whose identities are presently unknown but who participated in the fraudulent scheme or received fraudulent transfers.

2.      In a nutshell: Oorah had contracted with Covista Communications, Inc. ("Covista") to sell Covista's telecommunications services in exchange for a percentage of the monthly fees paid by Covista's customers.  By 2009, Covista had fallen behind in its payments to Oorah and, despite repeated promises to get current, it never did.  Oorah finally sued in 2011 after learning that Covista had been intentionally mis-classifying customers so as not to include their revenues in the calculation of the commissions owed (because Covista provided both the services and the billings to customers, Oorah was compelled to rely entirely on Covista to accurately report the relevant revenues to enable calculation of the commissions).  *Oorah, Inc. d/b/a Cucumber Communications v. Covista Communications, Inc.*, Index No. 652316/11 (Sup. Ct. NY Co.) (Bransten, J.) (the "NY Action").

3.      From the outset of the NY Action, Covista admitted that it owed Oorah several years of commissions, and it even produced a spreadsheet showing how it calculated what it still owed Oorah.  Thus, all that should have been necessary to conclude the matter was to verify Covista's spreadsheet against the underlying customer records and enter a judgment.  Defendants, however, conspired to ensure that that would not happen.  Thus, among other things, Defendants:

a.  knowingly created and submitted fake invoices that they asserted were evidence that Oorah supposedly owed Covista over a million dollars under a prior contract (more than what Covista was conceding it owed Oorah), thereby inducing the State Court to wrongfully grant Covista summary judgment on its counterclaim in the amount of over $2 million, with interest (the "Judgment"), based on those manufactured invoices;

b.  forced Oorah to incur well over one hundred thousand dollars in fees and expenses in filing an appeal bond staying enforcement of the fraudulently obtained Judgment until Oorah was ultimately successful in obtaining an order from the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, reversing entry of that Judgment and awarding Oorah summary judgment dismissing Covista's counterclaim and granting costs against Covista;

c.  falsely represented to the Court that they were searching and gathering, among other things, the data necessary to verify the commissions Covista owed Oorah, while simultaneously destroying that data in an act that the State Court held to be "grossly negligent if not intentional" spoliation;

d.  delayed the NY Action by moving for a change of venue based upon the representation, held by the State Court to be "false," that Covista had no contacts with New York when, in fact, the general counsel of Covista has his office in Manhattan (and the asserted lack of New York contacts was also inconsistent with the facts that, upon information and belief, Covista also had equipment in New York, provided services in New York, and was regulated by

the New York Public Services Commission);

e.  "sold" all of its assets to Birch during the pendency of the NY Action and then dissipated the proceeds of the sale so that Covista was rendered "judgment proof" before Oorah was able to procure a judgment.

4.    Based on the foregoing and other conduct, including that elaborated upon below, Oorah asserts claims against the Defendants for conspiring to deprive Oorah of the ability to collect the debt admittedly owed to Oorah through fraudulent conveyances, breaches of fiduciary duty, and violations of New York Judiciary Law § 487.

<u>**The Parties**</u>

5.    Plaintiff Oorah is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 1805 Swarthmore Ave., Lakewood, New Jersey 08701.

6.    Upon information and belief, Defendant Kane Kessler, P.C. is a professional corporation organized under the laws of the State of New York, operating as a law firm, with its principal place of business at 666 Third Avenue, New York, New York 10017.

7.    Upon information and belief, Defendant Gerard Schiano-Strain is and was at all relevant times an associate at Kane Kessler P.C., a member of the New York State Bar, and a citizen of the State of New York residing at 375 South End Avenue, New York, New York 10280.

8.    Upon information and belief, Defendant Birch Communications, Inc. is a corporation organized under the laws of the State of Georgia, with its principal place of business at 320 Interstate North Parkway SE, Atlanta, Georgia 30339.

9.    Upon information and belief, Defendant Ronald Kuzon is and at relevant times was Covista's General Counsel and a citizen of New York residing at 905 West End Avenue Apartment

6-3, New York, New York 10025 or at 500 East 77th Street, New York, New York 10162.

10.     Defendants John Does 1 through 10 are the persons (male, female, or corporate) whose identities are presently unknown, but who are the persons that received the proceeds of Covista's sale of its assets to Birch other than in good faith and for fair value and/or conspired with the other Defendants as described herein, and who may at all relevant times, upon information and belief, have been the officers, directors or the direct or beneficial owners of Covista but not citizens of New Jersey.

### Jurisdiction and Venue

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exclusive of interest and costs exceeds $75,000.

12.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District.

### ALLEGATIONS COMMON TO ALL COUNTS

### Covista's Scheme to Avoid its Debt

13.     Oorah is a non-profit entity affiliated with a national charity whose mission is to provide children and their families opportunities to become productive and engaged members of their communities.

14.     One way in which Oorah raised money was by marketing Covista's residential long-distance and calling-card telecommunications services to the Orthodox Jewish community in the tri-state New York City area.  Pursuant to the 2004 contract between Oorah and Covista (the "Agency Agreement"), Covista provided the telecommunications services, handled the billings, and remitted to Oorah, as a commission, a portion of what it collected from customers that had

been introduced by Oorah.  Because Covista had sole control of all the customer records upon which Oorah's commission depended, Oorah had the right to audit Covista's records to confirm that it was being paid appropriately.

15.     In or about 2009, Covista fell behind in its commission payments to Oorah due under the Agency Agreement.  In emails, telephone calls, and other communications over the course of more than the following year, Covista repeatedly affirmed its debt to Oorah and repeatedly promised to get current.  It never did.

16.     Worse, as Covista was continually promising to "get current" on the payments due to Oorah, Oorah began to see that Covista had been reclassifying customers in the reports it provided with the result that it was underreporting even the unpaid amounts due to Oorah.

17.     By August 2011, it became apparent that Covista would never pay the outstanding arrears and that Oorah would have to file suit.  Covista knew that it had no defense: it had already admitted owing Oorah commissions, and its own records would necessarily show whether the amount it admitted owing was in fact understated due to improper customer reclassifications. Therefore, acting through its officers and directors including Kuzon, Covista devised and implemented a tripartite scheme to avoid having to pay, a scheme that was able to be implemented only because it obtained the cooperation of each of the Defendants: (1) Kuzon would create fake invoices purporting to show that Oorah owed amounts that more than offset the amounts Covista had admitted owing to Oorah; (2) Covista would destroy the records that would reveal just how much it actually owed Oorah; and (3) Covista would either defeat Oorah's claim by offsetting it with the fake invoices or sell off its assets and dissipate the proceeds before Oorah could succeed in obtaining a judgment it could enforce.

**Defendants' Implementation of the Scheme**

18.     On August 9, 2011, Kuzon, Covista's General Counsel, forwarded to Oorah's litigation counsel two invoices dated the day before, August 8, 2011, which purported for the first time to invoice Oorah an aggregate of $803,830.06 (the "Newly Created Invoices").  The invoices purported to bill Oorah for "shortfalls" with respect to services supposedly provided as far back as May 2009, calculated under the parties' prior agreement, a November 1, 2001 "Reseller Agreement"—even though that 2001 agreement had been non-operative for years and was expressly superseded by a 2004 Agency Agreement between the Covista and Oorah, and even though Covista had never before claimed any such "shortfall."  Covista continued to send invoices through October 2012, claiming additional shortfalls each month under the superseded contract.

19.     On August 18, 2011, Covista, knowing that it was about to be sued, abruptly and improperly brought suit on its Newly Created Invoices in its home county in the Chancery Court of the State of Tennessee. *Covista Communications, Inc. v. Oorah, Inc*., No. 11-0635 (Hamilton County) (the "TN Action").  The TN Action was eventually dismissed for lack of personal jurisdiction and Covista's appeal of that dismissal was denied.

20.     Oorah commenced the NY Action on August 19, 2011, before it knew about Covista's anticipatory TN Action, and the Firm appeared on Covista's behalf on October 21, 2011, answering and asserting a counterclaim to recover on Covista's Newly Created Invoices.  The Firm thereafter proceeded to stonewall Oorah's efforts to obtain the underlying customer data on which the Newly Created Invoices necessarily had to have been based, and which would have revealed precisely how much Covista actually owed Oorah in commissions, until Covista could find a buyer for its assets and a co-conspirator in the destruction of its records.  To buy the time Covista needed, Kane Kessler then made a series of misrepresentations to the State Court.

21.     As alleged above, Covista generated the Newly Created Invoices on August 8, 2011, just ten days before filing suit on those invoices, purporting to bill Oorah for the first time in connection with telecommunications services that Covista provided as far back as 2009. Accordingly, if those invoices had any factual basis, they would have been based on Covista's customer records going back to 2009.  Those were the same customer records that were directly at issue on Oorah's claim under the Agency Agreement as they would definitively show how much Covista owed Oorah.   In the NY Action, Covista produced only a non-contemporaneous "summary" of what it asserted the underlying customer records supposedly showed.

22.     Accordingly, on or about February 16, 2012, Oorah served its First Set of Requests for the Production of Documents and Things which sought, among other things, "All documents concerning any summary or schedule of commission payments made or owed to Oorah by Covista…." (the "First Request").

23.     Covista failed to respond or object to the First Request on March 8, 2012, when due.

24.     By letter dated March 16, 2012, Oorah notified Kane Kessler that Covista was in default on its discovery obligations.  Kane Kessler did not respond.

25.     By letter dated March 23, 2012, Oorah noted Covista's continuing failure to provide responses to the First Request and its failure to respond to the March 16 letter, and that it would, therefore, adjourn the noticed deposition of Covista's representative pending receipt of the outstanding discovery demand.  To address the discovery defaults, on March 23, 2012, Oorah also requested a preliminary conference with the State Court.

26.     Covista's response to Oorah's efforts to obtain discovery was to move on or about April 20, 2012, eight months after the NY Action had been commenced and had been pending, to

dismiss the NY Action on the basis of *forum non conveniens*.

27.    Covista's *forum non conveniens* motion was supported by a memorandum of law, signed on behalf of the Firm, asserting that Covista "has [no] office in New York." [NYSCEF Doc. No. 13 at pp. 5, 6, 7].[1] *See also* Transcript of August 22, 2012 Hearing at 7:2-13 [NYSCEF Doc. No. 272] (Schiano-Strain stating that "Both parties here are New Jersey residents; none of them have an office in New York, at all" and characterizing the action as "a contract, a breach of contract cause of action between two New Jersey residents, neither of whom have any residence in New York, an office in New York or any business really in New York."); March 7, 2013, letter from Schiano-Strain to the State Court [NYSCEF Doc. No. 30] at p. 1, and March 8, 2013, letter NYSCEF Doc. No. 35] at p. 2 (each stating that Covista "does not have an office in New York" (emphasis in originals)).   That was untrue and the State Court ultimately denied Covista's motion in part because it was untrue: "Although Defendant initially contended that it did not maintain an office in New York, it came to light during discovery, and this Court became aware through supplemental submissions by the parties, that this contention is false."   Decision and Order dated July 16, 2013 [NYSCEF Doc. No. 81] at p. 10, p. 5 n.2; Decision and Order dated July 12, 2017 [NYSCEF Doc. No. 385] at p. 3.

28.    Upon information and belief, Kane Kessler knew its representations to be untrue, and without question it certainly should have known them to have been untrue given that its client's General Counsel had his office in New York, it had received documents from its client transmitted from a New York location, and Covista had received authorization from regulatory authorities to conduct business in New York and, upon information and belief, had both customers and equipment deployed in New York.   It nevertheless signed papers containing the representations

---

[1] Citations to "NYSCEF" refer to the court's electronic docket in the NY Action.

which signature, under 22 N.Y.C.R.R. § 130-1.1-a(b)(1), falsely certified that its assertions were not "frivolous" as defined in the Rules of the Chief Administrator of the New York Courts, and it failed to correct those statements after it undeniably knew the truth.

29.     The State Court denied Covista's *forum non conveniens* motion by Decision and Order dated July 16, 2013 [NYSCEF Doc. No. 81], fifteen months after it had been filed, but the damage had already been done.  Not only had Oorah been compelled to expend substantial resources opposing a motion that should never have been made because it was based on the false premise that Covista had no presence in New York, but Kane Kessler had succeeded in failing to produce any meaningful discovery and, in the meantime, Covista had lined up Birch as a co-conspirator who would assist with the remainder of the scheme—the destruction of records and dissipation of assets.

30.     Covista did not respond to Oorah's First Request until January 11, 2013, almost a year after responses were due, and then only because the State Court had imposed a final deadline. It produced a total of 72 pages of documents.  In response to the request for all documents concerning its summary of commissions paid or owed, Covista merely produced another summary purporting to list the active and inactive customers that had been introduced by Oorah, but again failed to produce the underlying records from which the summaries would necessarily have had to be created if those summaries actually had a factual foundation.

31.     At about the same time in January 2013, Oorah saw press reports indicating that Covista had agreed to sell certain of its assets to Birch.  To the extent that those assets included customers that Oorah had introduced to Covista, such sale directly undermined Covista's contention that the parties were operating under the 2001 "Reseller Agreement"—the superseded contract that Covista invoked to justify its Newly Created Invoices—because under that contract

such customers expressly belonged to Oorah and could not be sold.  Accordingly, Oorah wrote the State Court requesting a conference both to address Covista's continuing failure to produce meaningful discovery and seeking permission to depose Covista about the transaction (the pendency of Covista's *forum non conveniens* motion had resulted in a stay of deposition discovery).  Oorah expressed the additional concern that the sale meant that Covista would be going out of business even while the litigation over the debt it admitted owing to Oorah was still pending.

32.     Schiano-Strain responded in a January 21, 2013, letter to the State Court, explaining that Oorah's concerns were unfounded:

> Having learned that Covista *may* sell assets to a third party, Birch Communications ("Birch"), Oorah now urges this Court to modify its Order, dated December 4, 2012, which stayed depositions in this lawsuit pending the Court's determination of Covista's motion to dismiss for *forum non-conveniens.*  Oorah's request is completely devoid of merit in both fact and law.  Oorah's inflammatory language in its letter that Covista is "stripping the company of the ability to satisfy a judgment..." is not based on anything but Oorah's own conjecture.  Nothing has been presented to suggest that the proposed acquisition will not be for fair consideration or that the receipt by Covista of the purchase price will in any way diminish its ability to satisfy its just debts.  [NYSCEF Doc. No. 27 at p. 2 (emphasis in original).]

33.     The State Court permitted Kuzon to be deposed about the transaction with Birch and he testified, on March 15, 2013, that he had no idea when it would close, if ever.  The transaction closed less than two weeks later, on or about March 26, 2013, with Birch acquiring all assets and customers of Covista for a sale price of $4,000,000.  Oorah subsequently amended its complaint in the NY Action to assert a claim against Birch as Covista's successor.

34.     Kane Kessler then appeared in the NY Action **on behalf of Birch** and moved to dismiss the claim against Birch on the ground that Birch had merely purchased all of the assets of Covista, but it did not assume any of the liabilities.  At argument of the motion to dismiss on April

29, 2014, Schiano-Strain appeared for **both** Birch and Covista to argue that it was perfectly reasonable to leave all the liabilities with Covista because it "still exists" and "Covista had, well, $2.6 million in cash [received as the proceeds of the asset sale to Birch] as an asset.  It's not like Covista just is defunct and is no longer around; it has assets.  They're still litigating this lawsuit." [NYSCEF Doc. No. 27 at. 6:24-25; 8:7-10.]

35.     The State Court agreed with Kane Kessler's argument and held that the liabilities to Oorah remained with Covista and, on that basis, dismissed Oorah's claims against Birch by Decision and Order dated September 2, 2014, which was subsequently affirmed on appeal.

36.     In fact, when Schiano-Strain represented in April 2014 that Covista "still exists" and still had $2.6 million in cash from the Birch sale, he knew that to be untrue.  Covista "existed" only in the sense that the company had not been formally dissolved and it never even received— let alone could then still be holding—$2.6 million in that sale.  When that representation was made, Kane Kessler long had in its possession documents that showed that Covista had received a net amount of less than $325,000 from Birch, with the balance of the $4,000,000 "purchase price" going elsewhere, including approximately $1.7 million credited to Birch at closing.

37.     Meanwhile, Birch and Covista colluded to play "hot potato" with the customer data while Kane Kessler, acting as their joint agent, resisted producing that data in response to Oorah's document requests directed to each of them.  It was only after Birch had been dismissed as a defendant that Kane Kessler revealed that Birch had already destroyed the data Oorah needed to quantify how much it was owed.

38.     At a preliminary conference with the State Court on February 26, 2013, the State Court expressly ordered that the parties were to "continue full documentary discovery" during the pendency of the motions to dismiss.  Oorah followed up with a letter to Kane Kessler dated

February 28, 2013, pointing out that Covista's January production (eleven months late) of a mere 72 pages of documents, and none of the underlying accounting data, was grossly inadequate. At a compliance conference a month later, on March 19, 2013, the State Court agreed: it Ordered that "Defendant shall by April 2, 2013, complete its production of documents in response to Request Nos. 4, 9, 10, 12 and 14 through 19 or advise Plaintiff in writing that it is not in possession custody or control of any documents respons[ive] thereto."

39.     On the State Court's April 2, 2013, deadline, Schiano-Strain wrote Oorah's counsel unilaterally extending that deadline, stating that "Covista continues to search its files for responsive documents and will provide same to you, if any, by Friday, April 5, 2013." Three days after the deadline it extended unilaterally, Covista produced another 20 pages (for a grand total of 93 pages produced)—consisting of just a copy of the two agreements at issue—and by email Schiano-Strain represented that "my client has advised" that Covista "is not in possession, custody or control of any additional documents responsive to Plaintiff's document demands."

40.     To the extent that it was true that Covista did not have any additional documents, Schiano-Strain's statement was a direct admission of either spoliation or fraud. For example, and most glaringly, the first of the Newly Created Invoices purporting to bill Oorah in connection with customer transactions dating back to May 2009, was issued by Covista just nine days before Covista commenced litigation in Tennessee to collect on those very invoices. Those invoices were accompanied by spreadsheets purporting to show the claimed "shortfall" owed by Oorah based on the revenues attributed to customers introduced by Oorah for each month going back to January 2008. If those Newly Created Invoices had not been manufactured out of thin air, then Covista must have had the underlying customer data ten days before commencing litigation. But the underlying data was never produced and Kane Kessler was now saying—more than a year after

Oorah demanded those documents—that it no longer existed.

41.     Oorah pointed out the spoliation implication when it subsequently moved to compel.   At argument on that motion on August 29, 2013, Schiano-Strain doubled-down, representing to the State Court that "We've produced everything we have.   We can't get blood from a stone."   The State Court accorded Covista three weeks to be absolutely sure that statement was true and, if it was, to produce a "Jackson Affidavit" swearing that there were no documents. The Jackson Affidavit proved that counsel's statement was in fact false.

42.     A Jackson Affidavit was sworn to by Tamie Morgan, the "former Senior Staff Accountant" of Covista, on September 18, 2013, and filed by Kane Kessler.   Ms. Morgan noted that after the sale to Birch, all of Covista's files in Tennessee were shipped to its former CEO in New Jersey and, reviewing those files pursuant to the State Court's August 29, 2013, directive, she "discovered responsive documents" which numbered over 400 pages (but still did not include the underlying customer data).   She attested that there were no documents at any other location, except:

> I was unable to perform a search for electronically stored information ("ESI") data as Covista's servers have not been operational since March 2013 when Birch purchased Covista's assets.   While Covista is in possession of its servers, I am unable to conduct a search of the servers as I am not an Information Technology ("IT") professional nor am I trained in computer forensics.

In short, her affidavit confirmed not merely that it was not true that all responsive documents had been produced when it was repeatedly and conclusively represented that they had already been, but that Covista still had not searched its ESI data.   Moreover, the Jackson Affidavit established that: (1) until March 2013—thirteen months after Oorah served its First Request—the ESI (which would have included all of the critical customer data) was accessible to Covista in the normal course of business; and (2) Covista never searched that data and, instead, decommissioned its

servers during the pendency of Oorah's NY Action, making such data thereafter harder to search and retrieve; but (3) although Covista still was not searching its servers, they remained in Covista's possession.

43.      On December 20, 2013, the State Court directed Covista to search the servers that the Jackson Affidavit confirmed to still be in Covista's possession using search terms provided by Oorah.  Oorah provided those terms to Kane Kessler, but, after failing to produce any additional documents, Kane Kessler revealed a year later, on December 9, 2014, three months after Birch had been dismissed as a party, that it never conducted the search.  What is more, Kane Kessler disclosed that, in the interim, Covista had transferred those servers to Kane Kessler's other client, Birch, and Birch had thereupon exercised its "standard protocol" to erase all data on the servers it received even though it, too, was a defendant in the same NY Action and subject to a discovery request for that customer information.

44.      Thus, during the pendency of the action, Kane Kessler had one client—Covista— refuse to search its ESI, decommission its servers to make it harder to search, violate a State Court order requiring it to search, and then transfer the data to Kane Kessler's other client—Birch— which proceeded to destroy the data even while it was subject to an outstanding discovery request.

45.      After Birch was dismissed, Oorah moved for summary judgment as to liability on its claim for commissions due under the 2004 Agency Agreement; Covista had admitted liability, but had permitted the destruction of the documents that would quantify that liability, so Oorah also sought sanctions for Covista's spoliation of its ESI.  Oorah also moved to dismiss Covista's counterclaims predicated on the Newly Created Invoices inasmuch as they were predicated upon a 2001 agreement that had been expressly superseded by the 2004 Agency Agreement.

46.      Covista cross-moved for summary judgment on its counterclaim seeking payment

of its Newly Created Invoices.  In support of that cross-motion, Kane Kessler submitted a memorandum of law (NYSCEF No. 335, signed by Schiano-Strain) which repeatedly and correctly emphasized that summary judgment requires "an affidavit from a person with knowledge of the facts" and that "failure to provide an affidavit from someone with knowledge of the fact[s] is fatal to [a party's] evidentiary submissions because [such party] has failed to establish a foundation for the admissibility of those documents."  Having recognized the necessity to lay a proper foundation, Kane Kessler's memorandum falsely stated to the State Court that "Covista has submitted evidence in admissible form, together with an affidavit from a person with knowledge of the facts, which support Covista's cross-motion for summary judgment on its counterclaim."

47.     That representation, that it had submitted "evidence in admissible form, together with an affidavit from a person with knowledge of the facts" was false, and Kane Kessler knew it to be false.

48.     The only affidavit submitted in support of Covista's cross-motion for summary judgment was an affidavit from Ronald Kuzon, Covista's General Counsel, sworn to October 6, 2015.  Kuzon's affidavit was the only attempt to authenticate the Newly Created Invoices that were supposedly issued under the 2001 Reseller Agreement, which invoices were generated just nine days prior to commencing suit and more than three years after the transactions supposedly reflected on the invoices.  Kane Kessler knew that its representations as to those invoices being presented "in admissible form" with an affidavit "from a person with knowledge of the facts" were false because, *inter alia*:

    a.  The Newly Created invoices, generated for the first time in 2011 with respect to amounts supposedly due in 2009, obviously were not generated in the ordinary course of business and would not be admissible as business records.

16

b. The Newly Created Invoices were never authenticated nor was any basis presented for their admission as evidence. Indeed, Mr. Kuzon's affidavit made no effort to authenticate or lay any foundation at all for the admission of those invoices; it merely stated that "to support the counterclaim, Covista has also produced its invoices to Plaintiff which total $1,797,131.58. <u>Exhibit C</u>."

c. Kuzon had already testified—at a March 15, 2013, deposition defended by Schiano-Strain—that he had no affiliation with Covista before July 2010, so he necessarily had no personal knowledge of what had occurred in 2009. Further, he expressly testified that he had no knowledge of how customers were billed and how commissions were paid to Oorah in 2009: "It was 2009. I have no idea how they were doing it then." He disclaimed knowledge of how billing was done even after he joined Covista in 2010; his counsel, Schiano-Strain, asked him during his deposition, "Do you know about the billings?" and he answered: "Well, not really, because the billings were done down in Tennessee" whereas he was based in New York.

49. Further, Kane Kessler filed Kuzon's affidavit (and, upon information and belief, had a hand in drafting it) knowing full well that Mr. Kuzon did not join Covista until 2010 and, therefore, did not have personal knowledge of the other "facts" stated in his affidavit, among them:

a. That the parties entered into the Reseller Agreement in 2001, that it was "never terminated or superseded" and that after its initial two-year term, "it automatically renewed for successive one-year terms" and "[n]either party ever terminated the 2001 Agreement."

b. That the parties entered into the Agency Agreement in 2004, six years before

he joined the company, and that the latter agreement "did not supersede the former."

50.     Indeed, when Kane Kessler finally explained on appeal how the Newly Created Invoices were supposedly calculated, it was immediately apparent that they did not even accord with the superseded agreement that Kuzon claimed the invoices had been issued under.

51.     Kane Kessler also permitted (and potentially drafted) Mr. Kuzon's affidavit to be filed stating that "Covista has produced all documents in its possession custody or control that are responsive to Plaintiff's document demand," and pointing to Tamie Morgan's "Jackson Affidavit" as support for that statement.  Kane Kessler knew that to be untrue: it knew that the Jackson Affidavit expressly stated that Covista had never even searched its Tennessee ESI, and it knew (because its attorneys so informed the State Court in December 2014) that the ESI had been destroyed without ever having been searched.  Kane Kessler further knew—because it had signed and filed a brief so-stating on April 20, 2012—that "[a]ll duties relating to provisioning, billing and management of accounts that are the subject of the Agreements [with Oorah] were performed in Tennessee, payments made by customers were sent to and processed in Tennessee, and Covista's Tennessee personnel performed all services that were the subject of the Agreements." Kane Kessler also knew that the primary records reflecting the billing and management of those accounts were dispositive of the amounts (if any) due under the Agreements at issue and had never been produced.

52.     In response to the motion and cross-motion for summary judgment, the State Court granted Oorah judgment as to liability on its claim under the Agency Agreement (because Covista conceded it), held that Covista had spoliated its documents and, as a remedy, granted Oorah the benefit of an adverse inference during the future damages phase of trial.  But the State Court also

granted Covista a $2,617,362.13 judgment (including interest) on its counterclaim predicated upon the Newly Created Invoices, and permitted Covista to enter that judgment immediately.

53.     To prevent enforcement of Covista's judgment, Oorah was compelled to post an undertaking during its appeal.  By decision dated April 18, 2017 [NYSCEF Doc. No. 366], the panel of the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, unanimously reversed the grant of judgment to Covista and dismissed its counterclaims, awarding costs to Oorah, holding that it was self-evident that the 2001 agreement, under which Covista purported to justify its Newly Created Invoices, had been superseded by the 2004 Agency Agreement.

54.     On June 7, 2017, Oorah's costs on appeal were taxed by the Clerk of the Court at $85,785.25, with judgment thereon entered on that same day.  [NYSCEF Doc. No. 377.]  To date, Oorah has collected no part of that judgment and, upon information and belief, Covista has neither cash nor assets from which that judgment could ever be collected, let alone any judgment entered on the merits of Oorah's claim for which Covista has already admitted liability and for which a judgment of liability has already been granted.

55.     After the First Department dismissed Covista's counterclaims and remanded, Kane Kessler moved to withdraw as Covista's counsel in the NY Action.  (Kane Kessler had twice before moved to withdraw and twice before withdrew its motion after it had been fully briefed.)  This time, the motion was supported by an affirmation from Schiano-Strain asserting that the Firm moved to withdraw on "the ground that Covista has terminated the Firm as its counsel in this lawsuit" and, in doing so, "Covista has exercised its choice to terminate the Firm's services in this case."  Schiano-Strain supported his assertion that Covista terminated the relationship with a May 18, 2017, email from Covista's General Counsel, Kuzon, directing Kane Kessler to "cease and

desist from doing any more work on this case on behalf of Covista."

56.     Oorah had opposed Kane Kessler's motion to withdraw as yet another delaying tactic and had served its papers on Kuzon because the court had ordered Kane Kessler to serve its motion to withdraw on Kuzon as the Covista representative.  Kuzon then contacted one of Oorah's attorneys by email, stating that he had received Oorah's papers, and that he was inclined to put in his own papers in response to support Kane Kessler's motion to withdraw.  He did not put in papers on behalf of Covista, but Kane Kessler filed a reply memorandum of law, signed on behalf of the firm by Schiano-Strain) which reiterated that Covista "terminated its relationship with Kane Kessler and it is beyond question that a client has the right to terminate its counsel at any time."

57.     The State Court granted Kane Kessler's motion to withdraw because "Defendant Covista voluntarily discharged Kane Kessler PC's services" and, in such circumstances, it had "no discretion to deny the motion" given that the client has the right to terminate an attorney-client relationship at any time, with or without cause.  Decision and Order dated July 12, 2017 (confirming its decision entered on the record on June 27, 2017) [NYSCEF Doc. No. 385].  Noting that Covista already "has had several weeks to retain new counsel," the State Court ordered the case stayed until July 6, 2017, at which time Covista was directed to appear in court with replacement counsel.  The court explicitly warned that if Covista did not appear in court on July 6 with New York counsel, the court would invite Oorah to seek a default judgment.

58.     On July 6, 2017, Kuzon appeared in the State Court on behalf of Covista, but without replacement counsel, representing that he was "an attorney, but I'm not licensed to practice in New York.  I'm licensed in Massachusetts."  Upon information and belief, Kuzon was not actually licensed even in Massachusetts because he had been suspended for non-registration.

59.     While the State Court was unwilling to hear Mr. Kuzon because he was not a

member of the Bar, Mr. Kuzon told the court, on the record, what he had earlier stated to Oorah's counsel, that the very basis on which the court had granted Kane Kessler's motion, that it "was fired by" Covista, was "not true."   Mr. Kuzon argued that "[Covista] had a contingency arrangement with [Kane Kessler].  They refused to continue the contingency."  [NYSCEF Doc. No. 386, at 1:13, 5:3-6.]

60.    Kuzon had been served with Oorah's papers and, upon information and belief, he had been served with Kane Kessler's moving papers as well, so he was aware of the basis on which Kane Kessler was seeking to withdraw.  He remained silent while he knew that the court was granting the withdrawal motion in reliance upon the very fact that Kuzon subsequently claimed was not true.  He spoke up only after the court had granted the motion, and then only in an effort to use the withdrawal to Covista's advantage to further delay resolution of Oorah's claims, one of which Covista had already admitted it was liable on.  One of these attorneys obviously lied to the court—Kane Kessler was either fired or it was not—and the facts point to a coordinated effort: Kuzon facilitated Kane Kessler's withdrawal by supplying the email which Kane Kessler used as evidence that it had been fired, and then said nothing to contradict Kane Kessler's representations (even threatening to support Kane Kessler's motion), until the motion had been granted when Covista asserted the "misrepresentation" as an excuse for not having retained counsel so that the case could proceed.

## COUNT I
### (Violation of New York Judiciary Law Section 487)

61.    Oorah repeats and realleges each of the allegations contained in paragraphs 1 through 60, above, as if set forth in full again herein.

62.    During the course of the NY Action, Schiano-Strain and the Firm knowingly made misrepresentations (including by failing to disclose information when there was a duty to do so)

to the State Court and to Oorah, and conspired with Covista, Kuzon and Birch and the John Doe Defendants in making misrepresentations to the State Court and to Oorah, including as alleged above, for the purpose of advancing their common scheme to frustrate Oorah's ability to prove its damages and to delay the NY Action so as to enable Covista to dissipate its assets.

63.     Each of the Defendants benefitted from the scheme to prevent Covista from having to pay the amounts it owed Oorah because it resulted in each Defendant receiving money or property that it would not have received if Oorah had been paid.

64.     Oorah was damaged by Defendants' conduct in that it (a) compelled Oorah to needlessly investigate and respond to (and incur attorneys' fees in doing so) asserted facts and motions that were otherwise without merit, such as Covista's forum *non conveniens* motion that was falsely predicated upon not having a New York office; (b) enabled Covista and Birch to destroy the records that would have revealed precisely how much Covista owed Oorah; and (c) delayed Oorah's ability to obtain and enforce a judgment on its claim before Covista rendered itself judgment-proof.

65.     By reason of the foregoing, Oorah is entitled to judgment against Defendants, jointly and severally, in the amount of its actual damages to be determined at trial, with pre-judgment interest, trebled pursuant to New York Judiciary Law § 487.

### COUNT II
### (Fraudulent Conveyances)

66.     Oorah repeats and realleges each of the allegations contained in paragraphs 1 through 65, above, as if set forth in full again herein.

67.     Birch did not give fair consideration for its receipt of Covista's assets inasmuch as the transaction was not entered into in good faith.

68.     The proceeds from the sale of Covista's assets to Birch, and all other cash Covista

had, were distributed to individuals or entities, including John Does 1 through 10, without fair consideration.

69.     The distribution of the proceeds from the sale of Covista's assets to Birch and all other cash rendered Covista insolvent and/or left it with unreasonably small capital.

70.     The distribution of the proceeds from the sale of Covista's assets to Birch and all other cash occurred while Covista was a defendant in the NY Action and Covista has failed to satisfy the judgment rendered in favor of Oorah in the NY Action.

71.     Covista and, upon information and belief, each of the named Defendants, and each of John Does 1-10 who participated in the scheme to avoid the debt to Covista or received a distribution from the sale of assets to Birch, knew and intended that Covista's distribution of the proceeds of the sale to Birch would render Covista insolvent and unable to satisfy its obligations to Oorah and would thereby hinder, delay or defraud Oorah as a creditor.

72.     Covista's transfer of the proceeds of the sale of assets to Birch was both actually and constructively fraudulent as to Oorah and Oorah is, therefore, entitled to recover from each Defendant the uncollected amounts of its present and future judgment(s) against Covista to the extent that such Defendant received distributions from Covista, together with its attorneys' fees.

73.     Because each Defendant is a member of the conspiracy to deprive Oorah of the debt that it is admittedly owed, Oorah is entitled to recover from Defendants, jointly and severally, the full uncollected amounts of its present and future judgment(s) against Covista, together with its attorneys' fees.

## COUNT III
### (Fraudulent Conveyance Under NY Debt. & Cred. Law § 273-a)

74.     Oorah repeats and realleges each of the allegations contained in paragraphs 1 through 73, above, as if set forth in full again herein.

75.     Both the transfer of Covista's assets to Birch, and Covista's subsequent transfers of the proceeds of the sale to Birch and all other cash, were conveyances made without fair consideration while Covista was a defendant in the NY Action.

76.     Oorah received a final judgment against Covista which Covista has failed to satisfy.

77.     Each Defendant is liable for the amount received as such conveyances were constructively fraudulent as to Covista and all Defendants are jointly and severally liable for all amounts fraudulently transferred by reason of their participation in the conspiracy to render Covista unable to satisfy the judgment when rendered.

## COUNT IV
### (Breach of Fiduciary Duty)

78.     Oorah repeats and realleges each of the allegations contained in paragraphs 1 through 77, above, as if set forth in full again herein.

79.     Covista was insolvent at the time of its transfer of assets to Birch, if not earlier.

80.     Because Covista was insolvent, its officers and directors, including Kuzon, owed fiduciary duties to creditors such as Oorah, if not especially to creditors such as Oorah to which Covista had freely acknowledged owing an outstanding debt.

81.     By permitting Covista to render itself judgment-proof, Kuzon and each of Covista's officers and directors breached his or her fiduciary duties to Oorah.

82.     Each of the Defendants who was not an officer or director of Covista aided and abetted the breach of fiduciary duties by Kuzon and the officers and directors of Covista.

83.     Oorah has been damaged by such breaches of fiduciary duty, and is entitled to recover from Defendants, jointly and severally, the full amount that is due to it from Covista.

84.     The breaches of fiduciary duty were so malicious and outrageous that Oorah is further entitled to punitive damages from each Defendant.

WHEREFORE, Oorah prays for judgment:

A.   On its First Cause of Action, awarding Oorah judgment against each Defendant, jointly and severally, in the amount to be determined at trial, including pre-judgment interest, trebled pursuant to NY Judiciary Law § 487;

B.   On its Second Cause of Action, awarding Oorah judgment against each Defendant, jointly and severally, in the amount to be determined at trial, including pre-judgment interest and attorneys' fees;

C.   On its Third Cause of Action, awarding Oorah judgment against each Defendant, jointly and severally, in the amount to be determined at trial, including pre-judgment interest;

D.   On its Fourth Cause of Action, awarding Oorah judgment against each Defendant, jointly and severally, in the amount to be determined at trial, including pre-judgment interest and punitive damages; and

E.   On all causes of action, awarding Oorah post-judgment interest together with the costs of this action and such other and further relief as the Court deems just and proper.

Dated: New York, New York                         STORCH AMINI PC
        September 20, 2017


                                                  By:   _S/ Steven G. Storch_____
                                                        Steven G. Storch
                                                  2 Grand Central Tower
                                                  140 East 45th Street, 25th Floor
                                                  New York, NY 10017
                                                  (212) 490-4100
                                                  sstorch@storchamini.com

                                                  *Attorneys for Plaintiff Oorah, Inc.*

## **JURY DEMAND**

Oorah hereby demands a trial by jury.

STORCH AMINI PC

By:  _S/_ Steven G. Storch
          Steven G. Storch, Esq.

Dated: September 20, 2017