**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
OORAH, INC.,

                  Plaintiff,

v.

KANE KESSLER, P.C., GERARD SCHIANO-
STRAIN, ESQ., BIRCH COMMUNICATIONS
INC., RONALD KUZON and JOHN DOES 1-10,

                  Defendants.

-----------------------------------------------------------------x

                        Case No. 1:17-cv-07175-PAE

 

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT BIRCH COMMUNICATIONS INC.'S AND**
**DEFENDANTS KANE KESSLER P.C. AND GERARD SCHIANO-STRAIN'S**
<u>**MOTIONS TO DISMISS**</u>

 

**STORCH AMINI PC**
**Two Grand Central Tower**
**140 East 45th Street, 25th Floor**
**New York, New York 10017**
**(212) 490-4100**
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT FACTS ......................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

I.     DEFENDANTS IGNORE THE DISPOSITIVE ALLEGATIONS
       OF CONSPIRACY ................................................................................................ 5

       A.     Overt Acts and Intentional Participation in the Plan ............................... 6

              1.     The Fake Invoices ...............................................................................6
              2.     The Repeated Lies About Document Production .............................8
              3.     The Destruction of Documents ........................................................10

       B.     Agreement: Birch Joins the Conspiracy ............................................... 12

       C.     The Final Gambit ................................................................................... 14

       D.     Resulting Damage .................................................................................. 15

II.    EACH DEFENDANT IS ALLEGED TO HAVE DIRECTLY COMMITTED A
       WRONG IN FURTHERANCE OF THE CONSPIRACY ................................... 19

       A.     Kane Kessler Violated N.Y. Judiciary Law Section 487 ...................... 19

       B.     The Fraudulent Conveyance Claims ..................................................... 24

              1.     The Claims Are Not Time-Barred Under CPLR Section 202 .......25
                     a.     NY Debtor & Creditor Law Section 273-a .......................25
                     b.     Other Fraudulent Conveyances ........................................26

              2.     The Claims Are Well-Pleaded .........................................................29
                     a.     As to Birch ........................................................................29
                     b.     As to Kane Kessler...........................................................34

       C.     Breach of Fiduciary Duty: Aiding and Abetting................................... 36

III.   COVISTA IS NEITHER NECESSARY NOR INDISPENSIBLE ...................... 38

CONCLUSION................................................................................................................ 40

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    Page(s)

*360 W. 11th LLC v. ACG Credit Co. II, LLC,*
  90 A.D.3d 552 (1st Dep't 2011) ............................................................... 24

*Amalfitano v. Rosenberg,*
  428 F. Supp. 2d 196 (S.D.N.Y. 2006) ...................................................... 22

*Amalfitano v. Rosenberg,*
  903 N.E.2d 265 (N.Y. 2009) ........................................................ 21, 22, 23

*Amalfitano v. Rosenberg,*
  533 F.3d 117 (2d Cir. 2008) ...................................................................... 22

*Apostolic Faith Rescue Mission v. Slipyan,*
  89 N.Y.S.2d 721 (N.Y. App. Term, 2d Dep't 1949) ................................ 24

*Banco Popular North America v. Gandi,*
  876 A.2d 253 (N.J. 2003) .......................................................................... 35

*Bank of N.Y. v. First Millennium, Inc.,*
  607 F.3d 905 (2d Cir. 2010) ...................................................................... 23

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................................. 16

*Calvin Klein Trademark Trust v. Wachner,*
  123 F. Supp. 2d 731 (S.D.N.Y.2000) ....................................................... 36

*Canon U.S.A., Inc. v. Divinium Techs., Inc.,*
  2017 WL 696693 (S.D.N.Y. Feb. 21, 2017) ............................................ 23

*Chang Young Bak v. Metro-N. R. Co.,*
  2013 WL 1248581 ..................................................................................... 39

*Clark v. Advanced Composites Grp.,*
  2017 WL 2266981 (S.D.N.Y. Apr. 28, 2017) .......................................... 28

*Cont'l Cas. Co. v. Am. Home Assur. Co.,*
  2008 WL 1752231 (S.D.N.Y. Apr. 14, 2008) .......................................... 39

*Costalas v. Amalfitano,*
  760 N.Y.S.2d 422 (N.Y. App. Div. 2003) ............................................... 24

*Coyle v. Lefkowitz*,
    934 N.Y.S.2d 216 (N.Y. App. Div. 2011)........................................................ 25

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) ........................................................... 37

*Curtis v. Citibank, N.A.*,
    226 F.3d 133 (2d Cir.2000)........................................................................... 23

*DIMON Inc. v. Folium, Inc.*,
    48 F. Supp. 2d 359 (S.D.N.Y. 1999) ............................................................. 20

*Eye Encounter, Inc. v. Contour Art, Ltd.*,
    81 F.R.D. 683 (E.D.N.Y. 1979) .................................................................... 38

*Federal Deposit Ins. Cor. v. Porco*,
    552 N.Y.S.2d 910 (1990) ......................................................................... 34, 35

*Fisk v. Letterman*,
    424 F. Supp. 2d 670 (S.D.N.Y. 2006) ............................................................. 5

*Frink America, Inc. v. Champion Road Machinery Ltd.*,
    961 F. Supp. 398 (N.D.N.Y. 1997) ............................................................... 38

*Fuqua v. Bristol-Myers Squibb Co.*,
    926 F. Supp. 2d 538 (D.N.J. 2013) ............................................................... 38

*Haber v. ASN 50th St. LLC*,
    847 F. Supp. 2d 578 (S.D.N.Y. 2012) ............................................................. 5

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995).................................................................*Passim*

*In re Allou Distributors, Inc.*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) .............................................................. 35

*Indosuez Int'l Finance, B.V. v. Nat'l Reserve Bank*,
    758 N.Y.S.2d 308 (1st Dep't 2003) ......................................................... 23, 24

*Izko Sportswear Co. v. Flaum*,
    809 N.Y.S.2d 119 (2d Dep't 2006) ............................................................... 22

*Legani v. Alitalia Linee Aeree Italiane, S.p.A.*,
    400 F.3d 139 (2d Cir.2005)........................................................................... 23

*Lia v. Saporito*,
   541 F. App'x 71 ..................................................................................... 28, 29

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
   471 F.3d 377 (2d Cir. 2006) .......................................................................... 38

*Melcher v. Greenberg Traurig LLP*,
   24 N.Y.S.3d 249 (1st Dep't 2016) ............................................................ 21, 22

*Oorah, Inc. v. Covista Commc'ns, Inc.*,
   30 N.Y.S.3d 626 (1st Dep't 2016) .................................................................. 34

*Oorah, Inc. v. Covista Commc'ns, Inc.*,
   52 N.Y.S.3d 347 (N.Y. App. Div. 2017) ........................................................... 8

*Polanco v. NCO Portfolio Management, Inc.*,
   23 F. Supp. 3d 363 (S.D.N.Y. 2014) ................................................................ 22

*Polargrid LLC v. Videsh Sanchar Nigam Ltd.*,
   2006 WL 2266351 (S.D.N.Y. Aug. 7, 2006) ....................................................... 39

*Robinson v. Concerta Health Servs., Inc.*,
   781 F.3d 42 (2d Cir. 2015) ............................................................................ 28

*Rosco Trading v. Goldberg*,
   182 N.Y.S. 711 (Special Term, N.Y. Co. 1920) .................................................... 5

*S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*,
   84 F.3d 629 (2d Cir. 1996) ........................................................................... 20

*Scantek Med., Inc. v. Sabella*,
   583 F. Supp. 2d 477 (S.D.N.Y. 2008) ............................................................... 17

*Schindler v. Issler & Schrage, P.C.*,
   692 N.Y.S.2d 361 (1st Dep't 1999) .................................................................. 22

*Setters v. AI Props. & Devs. (USA) Corp.*,
   32 N.Y.S.3d 87 (1st Dep't 2016) ..................................................................... 25

*Southern Indus. v. Jeremias*,
   411 N.Y.S.2d 945 (2d Dep't 1978) ................................................................... 30

*Staudinger+Franke GMBH v. Casey*,
   2015 WL 3561409 (S.D.N.Y. June 8, 2015) ............................................... 17, 30, 36

iv

*Storey v. Cello Holdings, L.L.C.,*
  347 F.3d 370 (2d Cir. 2003) ................................................................... 23

*Temple v. Synthes Corp. Ltd.,*
  498 U.S. 5 (1990) .................................................................................. 39

*Topeover Corp. v. ENE Group LLC,*
  2013 WL 822378 (S.D.N.Y. March 6, 2013) .......................................... 17

*Treppel v. Biovail Corp.*,
  2004 WL 2339759 (S.D.N.Y. Oct. 15, 2004*)* .......................................... 5

*Trepel v. Dippold*,
  2015 WL 1107010 (S.D.N.Y. May 9, 2005*)* ........................................... 22

*Trugman-Nash, Inc. v. New Zealand Dairy Bd.*,
  942 F. Supp. 905 (S.D.N.Y. 1996*)* ....................................................... 38

*Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Prod. Holdings (N. Am.) Inc.*,
  942 F. Supp. 733 (S.D.N.Y. 1997*)* ....................................................... 38

*Wiggin v. Attorney Anonymous,*
  115 Misc. 2d 1071 (N.Y. City Civ. Ct. 1982) ........................................ 22

## Statutes

N.Y. Judiciary Law Section 487 ...........................................................*Passim*

NY Debtor & Creditor Law Section 272 ............................................ 29, 30

NY Debtor & Creditor Law Section 273-a ................................ 25, 26, 29, 33, 35

NY Debtor & Creditor Law Section 274 ................................................. 29

NY Debtor & Creditor Law Section 275 ................................................. 29

## Rules

Federal Rules of Civil Procedure 8 ...................................................... 29

Federal Rules of Civil Procedure 9(b) .................................................. 37

Federal Rules of Civil Procedure 19(a)(2)(i) ......................................... 38

CPLR § 202 .......................................................................................... 25

CPLR § 3211.................................................................................................... 34

CPLR § 5013.................................................................................................... 34

**<u>Regulations</u>**

22 N.Y.C.R.R. 1200.0................................................................................... 6, 7

22 N.Y.C.R.R. § 130-1.1 ................................................................................ 6

Plaintiff Oorah, Inc. ("Oorah") respectfully submits this memorandum of law, together with the accompanying declaration of Casey J. Hail, dated December 22, 2017 (the "Hail Decl."), and the exhibits thereto, in opposition to the two motions to dismiss submitted by, respectively, defendant Birch Communications, Inc. ("Birch") (Dkt. Nos. 26-28) and defendants Kane Kessler, P.C. and Gerard Schiano-Strain, Esq. (together, "Kane Kessler") (Dkt. Nos. 29-31).

## PRELIMINARY STATEMENT

Plaintiff has an uncollectible $83,000 judgment against an entity called Covista, Inc. ("Covista"), and, when an existing judgment on liability is quantified, expects shortly to obtain an additional uncollectible judgment against it that may be several million dollars more.[1]  As alleged in its Complaint herein, plaintiff's judgment in that action is uncollectible today only because of the coordinated and tortious efforts of defendants.

Plaintiff's detailed Complaint describes how each one of the moving defendants committed at least one tort designed to defeat plaintiff's ability to obtain a judgment and collect it: Birch took Covista's assets in a fraudulent conveyance and destroyed the Covista records that would show precisely how much Oorah was owed.  Kane Kessler facilitated that wrongdoing by simultaneously representing both Covista and Birch in the litigation wherein Oorah was attempting to collect what was owed.  Kane Kessler was not merely counsel for both when the transfers were occurring and documents were being destroyed, it violated Judiciary Law section 487 by repeatedly lying to plaintiff and the State Court about the documents that were destroyed and other factual matters in order to delay the proceedings and allow Covista to dissipate the proceeds received from Birch.

---

[1] The New York State Supreme Court (the "State Court") previously awarded plaintiff a judgment of liability on its breach of contract claim against Covista, so all that remains is an inquest to quantify plaintiff's damages on that claim.

The concrete facts alleged in the Complaint do not merely describe the conspiracy plausibly, they describe it compellingly.

Indeed, Kane Kessler was kind enough to provide, in their brief to this Court, a small taste of their willingness to play fast and loose with the facts.  For example, they state definitively in a footnote: "No final judgment on damages has been entered in the State Action."  (Mem. of Law in Supp. of Defs.' Kane Kessler, P.C.'s and Gerard Schiano-Strain, Esq.'s Rule 12(b) Mot. to Dismiss Pl.'s Compl. ("KK Br.") at 2, n.5.)  But a final judgment in Oorah's favor **has** been entered in the State Action in the amount of $85,785.25, as not only alleged in the Complaint, but as is apparent from the docket in the State Action entered while Kane Kessler was still counsel for the defendant. (*See* Compl. ¶ 54.)[2]  As another example, Kane Kessler makes light of its submission of an affidavit to the State Court falsely stating that Covista had no presence in New York by stating that Covista's General Counsel, Ronald Kuzon, testified at his deposition "that he occasionally used a desk in a New York office suite to conduct business for Covista. Based on the deposition testimony, the KK attorneys notified the court that Kuzon used an office in New York."  (KK Br. at 4.)  That bit of revisionist history is belied by the transcript of the deposition inasmuch Kuzon **never** testified that he "occasionally used the desk in a New York office suite" but, rather, testified as follows:

> Q. Do you have an office in New York?
> A. I maintain an office in New York.
> Q. And where is that address?
> A. One Liberty Plaza.
> Q. That's downtown?
> A. Yes.
> Q. That's a Covista office?
> A. It's a combination of a Covista office and my own office.

---

[2] Any attempt to split hairs to defend Kane Kessler's statement on the basis that Oorah's existing judgment was for "costs" and not "damages" would be disingenuous because the footnote was appended to the assertion that plaintiff "alleges" Covista is judgment-proof.  In that context it makes absolutely no difference whether the unsatisfied judgment was for costs or damages.

(Hail Decl. Ex. A at 5:4-12).  Nevertheless, that phantom "desk" is referred to 5 separate times in Kane Kessler's brief (*see* KK Br. at 5, 8, 8 n.20, 15, 17).  And while Kane Kessler implies that they satisfied their obligation to correct the record by stepping up to "notify the court that Kuzon used an office in New York," in fact it was Oorah that notified both Kane Kessler[3] and the State Court *before* the deposition that Covista maintained an office in New York (*see* Hail Decl. Ex. D), and it was Oorah that requested the conference with the State Court to supplement the record after its suspicions were confirmed by Kuzon (Hail Decl. Ex. E at 2:8-23).  And the State Court most certainly did not determine "that when discovery revealed that Kuzon occasionally used a desk in a New York office suite, the KK Attorneys brought that fact to the Court's attention. Thus, there was no misrepresentation."  (KK Br. at 8.)  Actually, the State Court found that Kane Kessler had merely "reiterated and confirmed" what Oorah's counsel had been saying about New York and that, in fact, there had been a misrepresentation insofar as it expressly found Kane Kessler's prior representations to have been "false."  (Hail Decl. Ex. F at 10.)

The above examples from Kane Kessler's present motion are relatively trivial; what is alleged in the Complaint is, however, egregious:  Kane Kessler not only lied to the State Court about Covista's New York office—causing the delay and expense of unnecessarily having to brief (and have the State Court address) an issue that should not have been an issue at all—but knowingly submitted false evidence to the State Court to obtain a judgment (subsequently reversed) under false pretenses, lied to the State Court about having produced all of Covista's documents when they knew that not to be true, and then permitted their clients to destroy

---

[3] On March 6, 2013, Oorah alerted Kane Kessler to the fact that Kuzon "work[ed] out of the offices of General Telecom, 'a Covista Communications company' in lower Manhattan."  (Hail Decl. Ex. B at 1.)  Despite *later* acknowledging that to be true after Kuzon's deposition, immediately subsequent to Oorah's notification, Kane Kessler continued to represent to the State Court that "Covista…<u>does not have an office in New York</u>." (Hail Decl. Ex. C at 1 (emphasis in original).)

documents even while they were under an Order from the State Court to search for and produce them.  Not only are the supporting facts alleged in detail, but those facts clearly demonstrate *scienter*, as discussed below.

Birch, for its part, acquired all of Covista's assets while Oorah's claims against Covista were pending, including the business records that it knew Oorah was seeking in discovery from Covista.  It then destroyed those records while it was a party in the State Action, represented, as was Covista, by Kane Kessler, and subject to its own discovery demands for those documents.  Birch's document destruction was discovered only after Birch's dismissal from the action.  Here, too, the facts alleged provide compelling evidence of *scienter*, as discussed below.

Both Birch and Kane Kessler are mistaken in asserting that Oorah's claims are time-barred, and both are wrong in asserting that certain claims cannot be asserted against them, because both wholly overlook the fact that a more-than-plausible conspiracy is alleged that ties each defendant to the wrongdoing of the others.  Both try to hide behind *res judicata*, but that provides no cover for Birch insofar as the fraudulent conveyance claim was not, and could not have been, asserted against it in the State Action, and Kane Kessler's argument is just backwards: the State Court explicitly found wrongdoing on Kane Kessler's part and if *res judicata* applies here at all, it will apply only to preclude it from re-litigating issues already decided against it or its client.

## RELEVANT FACTS

Plaintiff's Complaint lays out the salient facts in detailed allegations and any effort to summarize those 65 paragraphs here would necessarily be lengthy and still leave much out.  Inasmuch as those well-pleaded allegations are presumed true for purposes of this motion, the Court is respectfully referred to the Complaint for its full contents, and certain of the allegations will be discussed in more detail below in connection with the relevant law.

## ARGUMENT

### I.   DEFENDANTS IGNORE THE DISPOSITIVE ALLEGATIONS OF CONSPIRACY

While New York does not recognize conspiracy as an independent cause of action, it does recognize that a conspiracy can tie defendants to the wrongdoing of co-conspirators.  "Under New York state law, a plaintiff may claim civil conspiracy alongside an 'otherwise actionable tort.'" *Haber v. ASN 50th St. LLC,* 847 F. Supp. 2d 578, 588 (S.D.N.Y. 2012 (citation omitted)). The plaintiff must "demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Treppel v. Biovail Corp.*, No. 03 Civ. 3002(PKL), 2004 WL 2339759, at *19 (S.D.N.Y. Oct. 15, 2004); *accord Haber*, 847 F. Supp. 2d at 589; *Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006).

A defendant, like Birch, that joins the conspiracy after it is already operating, nevertheless remains liable for the acts of co-conspirators that occurred even before it joined.  *E.g., Rosco Trading v. Goldberg*, 182 N.Y.S. 711, 714 (Special Term, N.Y. Co. 1920) ("by subsequently uniting in the conspiracy, the defendant corporation made itself liable for acts previously done by its co-conspirators").

As discussed below, Oorah has plead the requisite elements of an underlying tort.  Oorah has set forth a litany of "overt acts" in furtherance of that conspiracy, along with Kane Kessler's and Birch's intentional participation with Covista in those acts in furtherance of the plan to render Covista judgment-proof.  Many of those acts occurred via defendants' on-the-record, affirmative representations to the State Court, whether via submission or during hearings (including one such representation expressly held by that Court to be "false" and other such representations).  This is not a case in which much need be inferred.

The conspiracy alleged here sought to defeat Oorah's legitimate claim and its ability to collect its judgment thereon, both by falsifying evidence so that Oorah would not obtain a judgment at all, and by denuding Covista of all assets so that any judgment it did obtain would be uncollectible and worthless.  It began with the falsification of evidence before any suit was even filed.

### A.    Overt Acts and Intentional Participation in the Plan

#### 1.    The Fake Invoices

After months of promising to get current on amounts that it admitted owing Oorah but making only token payments (Compl. ¶ 15), and after Oorah's discovering that even those conceded amounts were understated because Covista had been altering its records to reclassify customers for whom it owed Oorah commissions (*id.* ¶ 16), and just as it became clear that Oorah was about to file suit in August 2011, Covista suddenly "discovered" that Oorah supposedly owed it substantial monies dating back to 2009 that more than offset the amounts it owed Oorah, but which it had never invoiced or previously claimed (*id.* ¶ 17).  So, on August 8, 2011, just ten days before Oorah would file suit, Covista created invoices for services supposedly rendered from 2009 through that date, and purported to issue them the 2001 Reseller Agreement (the "Reseller Agreement") that had been expressly "superseded" by the 2004 Agency Agreement (the "Agency Agreement") (*see id.* ¶¶ 17-18).  Ronald Kuzon, Covista's General Counsel, conveyed that invoice to Oorah and continued to send invoices under the old contract as the litigation progressed, ultimately quantifying Covista's counterclaim based on those invoices at $1,797,131.58, plus interest thereon (*see id.* ¶ 21).

These invoices were, to put it gently, inherently suspicious.  Given those obvious red flags, it is inconceivable that Kane Kessler complied with its ethical obligations before filing a counterclaim based on those invoices.  (*See* 22 N.Y.C.R.R. § 130-1.1-a, 22 N.Y.C.R.R. 1200.0

rules 1.0(k); 3.3.)   When Kane Kessler subsequently cross-moved for summary judgment, it revealed that it had not undertaken any efforts to authenticate the invoices previously because it could not authenticate them even then.  (Compl. ¶ 46-48, 50.)  Kane Kessler's motion for summary judgment was accompanied by a memorandum of law that emphasized that a supporting affidavit had to be based on personal knowledge (Compl. ¶ 46, Hail Decl. Ex. G at 7-10), but it supported its own motion with only Kuzon's affidavit.  But Kuzon had previously revealed at deposition that he was not employed by Covista when the earliest of the billed services had been rendered, confessed to knowing nothing about how Covista billed, and in fact testified that the parties could not legally perform the contract pursuant to which the invoices were supposedly generated because it would have violated telecommunications laws.[4]   Kane Kessler did not try to authenticate the invoices, but merely attached them to Kuzon's affidavit—after he denied all knowledge at his deposition—stating "[f]urthermore, to support the counterclaim, Covista has also produced its invoices to Plaintiff which total $1,797,131.58.  Exhibit C."  (Compl. ¶ 48(b), Hail Decl. Ex. I at ¶ 22.)  Indeed, Kane Kessler filed and relied upon Kuzon's affidavit even though it made both declaratory statements about matters as to which Kuzon could not have had personal knowledge because he was not employed by Covista at the relevant time (*see, e.g.*, Compl. ¶ 49) and statements that were patently untrue, which Kane Kessler knew to be untrue (*see, e.g.*, Compl. ¶ 51).  Kane Kessler introduced false evidence that it could not authenticate, and supported it with testimony that it knew to be false.  (Compl. ¶¶ 46-51.)[5]  As discussed below, it not only permitted

---

[4] The invoices themselves were outside the scope of that deposition because the court had ordered it to proceed for the limited purpose of inquiring into the sale of assets to Birch, discussed below, while deposition discovery was otherwise stayed during the pendency of Birch's motion to dismiss.  (Compl. ¶¶ 48-49, Hail Decl. Ex. H at 9:21–10:9.)

[5] Indeed, in briefing to the Appellate Division, Kane Kessler explained for the first time how the invoices were supposedly calculated.  The fact that its explanation was inconsistent with the contract under which they were supposedly issued further proves that Kane Kessler never examined the invoices, or simply did not care.  (Compl. ¶ 50.)

Kuzon to make other false statements in his affidavit that it unquestionably knew to be false (Compl. ¶ 51), but also repeatedly made those same assertions itself with full knowledge that they were false (Compl. ¶ 41).

Thus, Kane Kessler let Kuzon tell the State Court, *inter alia*, that Oorah "was provided with invoices for the…amount owed to Covista to which it never objected," (Hail Decl. Ex. I at ¶ 32), knowing full well that Oorah had in fact objected by filing its action against Covista just ten days after receiving those newly-generated invoices and by denying the allegations of the counterclaim based on them.  It allowed Kuzon to state that Covista acknowledged owing Oorah money but that it failed to pay "based on the fact that Plaintiff owes Covista the larger sum of $1,797,131.58 (*id.* ¶ 19), even though Kane Kessler knew there was documentary evidence that Covista had acknowledged its arrears for years (Compl. ¶ 15, Hail Decl. Ex. J) and that the "larger sum" could not motivated Covista's non-payment because the fake invoices did not exist until the eve of the litigation years later.  Based on Kane Kessler's submissions, the overworked State Court actually granted Covista a $2,617,362.13 judgment (including interest) on its counterclaim, and even permitted Covista to enter and enforce its judgment while Oorah's claims were still pending. Oorah was forced to incur over $80,000 to bond that judgment.  (Compl. ¶¶ 53-54.)  The Appellate Division, First Department (the "Appellate Division"), subsequently set things right and reversed (Compl. ¶¶ 52-54), stating that the "unambiguous" merger clause of the Agency Agreement provided that it superseded the earlier contract, a conclusion further supported given the "conflicting provisions" regarding the calculation of commissions contained in the two contracts. *Oorah, Inc. v. Covista Commc'ns, Inc.*, 52 N.Y.S.3d 347 (1st Dep't 2017).

### 2.  The Repeated Lies about Document Production

Each of the fake invoices was accompanied by a spreadsheet that purported to show how the invoiced amount was calculated.  It was those spreadsheets that Kane Kessler eventually

revealed, when it finally explained them, to be inconsistent with the contract under which the invoices were supposedly issued.  (*See supra* p. 9; Compl. ¶ 40.)  Those spreadsheets purported to identify Covista's aggregate monthly revenue from the customers for which Oorah was entitled to receive a commission.  (*Id.*; *see, e.g.* Hail Decl. Ex. K.)  Inasmuch as they aggregated data, there necessarily must have been underlying data to aggregate—either that, or the invoices and spreadsheets were manufactured out of whole cloth.

It is exactly that underlying data that Oorah futilely endeavored to obtain from Covista before it was ultimately destroyed by Covista and Birch.  Because Oorah merely introduced customers to Covista, and was compensated by reference to the services those customers purchased from Covista each month, Covista was the exclusive custodian of the data Oorah needed to prove what commissions were owed.  (*See* Compl. ¶ 37.)  That data would also have demonstrated to what extent Covista had been misclassifying customers in order to reduce Oorah's commissions— an important inquiry given that, even without access to Covista's data, there was already evidence of such a practice occurring.  (*See* Compl. ¶ 16.)  Further, that data would have allowed Oorah to test the spreadsheets provided by Covista that purportedly demonstrated Oorah's debt to Covista, another important inquiry given that the spreadsheets were inconsistent with other summary data Covista produced.[6]  Kane Kessler never produced that underlying data, and it was eventually destroyed by Covista and Birch.

Therefore, unless Kane Kessler knew there was no data to support the fake invoices, it necessarily knew both that the underlying data existed, and that it had never been produced to

---

[6]  The discrepancies were minor—but any discrepancy is evidence that at least one of the spreadsheets was not filled by computer directly from the underlying data.

Oorah.  Under those circumstances, Kane Kessler[7] also necessarily knew it to be untrue when it repeatedly represented to the State Court, as counsel, that Covista had "produced everything that we have.  We can't get blood from a stone[,]"  (Compl. ¶ 41; Hail Decl. Ex. L at 18:12-13), and again that "You can't draw blood from a stone.  If we produced everything that we have, we've produced everything that we have[,]" (Hail Decl. Ex. L at 19:22-24).

Though the destruction of relevant documents was the most egregious manifestation of Kane Kessler's disregard for the discovery process, it was not the first; nor was it the first to require the State Court's intervention.  Kane Kessler did not submit Covista's responses to Oorah's very first request for production until nearly a year after those requests were issued and those responses were due.  (Compl. ¶¶ 22-26, 30.)  In the face of Kane Kessler's continued dismissive representations that Covista was continuing to search its files for responsive documents—despite production of an impossibly small amount of material (Compl. ¶ 39)—Oorah was forced to move to compel production from Covista (*see* Compl. ¶ 41).  It was only as a result of the State Court granting that motion that Oorah learned Covista had failed to search the servers located at its own headquarters before it arranged to have the information destroyed.  (*See* Compl. ¶ 42.)

### 3.   The Destruction of Documents

Kuzon's and Kane Kessler's lies about the search for and production of Covista's data continued for almost one and a half years, through at least six court appearances, until the State Court had enough and directed Covista to produce a "Jackson Affidavit" describing its efforts to locate and produce all relevant documents.  (*See* KK Br. at 5 & n.11.)  In its brief to this Court, Kane Kessler accurately describes the affidavit it produced on September 19, 2013, as attesting

---

[7] Throughout this memorandum, Oorah has made every effort to avoid referencing Mr. Schiano-Strain individually where possible.  However, to be clear, the vast majority of the representations made by Kane Kessler in the State Action, including all oral representations made at any hearings or conferences, were made by Mr. Schiano-Strain.

that the affiant, Tamie Morgan, did not and "could not search Covista's servers because she was unable to gain access as they had been decommissioned following the asset sale." (*Id*. at 5.)  The "asset sale" to which she refers is the sale to Birch, which did not occur until March 2013.  (Compl. ¶ 42, Hail Decl. Ex. M at ¶ 7.)  Thus, that "decommissioning" did not occur until over one and a half years after the State Action commenced, over one year after Oorah issued document requests to Covista that called for production of the material contained thereon, and after Kane Kessler repeatedly represented that it had produced all of the relevant documents in Covista's possession, custody and control.  Importantly, she stated that despite the sale, "Covista is [still] in possession of its servers"—six months later—but she could not search the servers because "I am not an information technology ('IT') professional nor am I trained in computer forensics." (*Id*.)

In other words, Covista could have searched the servers during the first one and a half years of litigation.  It did not.  Even after March 2013, Covista could have searched the servers by utilizing an IT professional.  It did not.  The servers Ms. Morgan referenced were presumably located in Tennessee where Covista's headquarters had been (*see id*. ¶ 3), and where Kane Kessler represented that all of Covista's billing records and customer data were kept when previously arguing that the State Court should dismiss Oorah's action on the basis of *forum non conveniens* (Hail Decl. Ex. N at 3).[8]  In other words, those servers almost certainly contained the customer data Oorah had been seeking to prove its damages.

On December 20, 2013, the State Court directed Covista to search for and produce any responsive electronic documents in its possession, using search terms Oorah would provide.

---

[8] It was in connection with that motion that Kane Kessler misrepresented to the state court that Covista had no presence in New York, a representation that the State Court subsequently found to be "false."  (*See supra* p. 3.)  Covista had filed a preemptive action against Oorah in Tennessee the [day] before Oorah had commenced the State Action (Oorah was then unaware of the Tennessee action because it had not yet been served), which action was dismissed for lack of personal jurisdiction and that dismissal upheld on appeal.

(Compl. ¶ 43.)  Oorah provided such terms to Kane Kessler on January 31, 2014.  (*Id.*)  The servers were never searched and it was not until a court conference, about a year later on December 9, 2014, that Kane Kessler confessed and explained that subsequent to Ms. Morgan's affidavit, Covista transferred the servers to Birch and Birch wiped all the data.  (*Id.*)

Given that it had admitted the destruction of the servers taken from Covista's headquarters, Kane Kessler necessarily knew that Kuzon's statement in his affidavit in support of Covista's cross-motion for summary judgment was false when it recited: "Covista has produced all documents in its possession, custody or control that are responsive to Plaintiff's document demands." (Compl. ¶ 51, Hail Decl. Ex. I at ¶ 23.)  In other words, Kane Kessler filed that affidavit knowing that not a single electronic document collected from the servers at Covista's own headquarters had been produced in the State Action.  Kane Kessler reiterated those same false assertions at oral argument—even outright contradicting Ms. Morgan's affidavit—claiming that "[w]e searched the servers that we had.  We gave them everything we had that was relative to the claim and responsive to their document demand.  You can't get blood from a stone."  (Hail Decl. Ex. O at 9:11-14.)  That destruction brings us to Birch's role in the conspiracy.

### B.  Agreement: Birch Joins the Conspiracy

One and a half years into the State Action, Oorah learned that Covista was selling itself to Birch and convinced the State Court to permit a deposition to inquire about the sale, despite the stay of discovery that had resulted from the pendency of Covista's *forum non conveniens* motion. (Compl. ¶ 31.)  Covista's General Counsel, Kuzon, was deposed on March 15, 2013, and despite having been produced by Covista to testify specifically about the sale, denied any knowledge of when the sale would close.  In fact, it closed 11 days later, on March 26, 2013.  (*Id.* ¶ 33.)

Kuzon testified at his deposition that he was not employed by Covista at the times it executed the Reseller Agreement and subsequent Agency Agreement (Compl. ¶ 48(c); Hail Decl.

12

Ex. A at 6:9-23), that he knew nothing about Covista's billing practices (Compl. ¶ 48(c); Hail Decl. Ex. A at 21:24–22:3, 24:4-19), that it would have been illegal under FCC rules for the parties to have operated under the superseded Reseller Agreement (Hail Decl. Ex. A at 11:3-17), and that neither he nor anyone else at Covista knew which, if any, active customers had been procured under the superseded Reseller Agreement (*id.* at 69:8-19).  That testimony should have—but did not—stop Kane Kessler from subsequently seeking summary judgment for Covista on its counterclaim based solely on fake invoices supposedly issued by Kuzon under the Reseller Agreement and Kuzon's substance-free affidavit.  (*See supra* pp. 7-8.)

Regarding the sale to Birch, Kuzon testified that Covista's billings to its customers included a charge to them for the commissions owed to Oorah (Hail Decl. Ex. A at 21:4-14), that all such active customers were being sold to Birch (*id.* at 29:2-10), and that there was no provision in the purchase agreement for payment of past (*id.* at 54:5-8) or future (*id.* at 69:21-24) commissions owed.  It was his position that Birch was purchasing only "assets," meaning the customers, not the contracts under which those customers were procured and commissions owed. If Kuzon is to be believed, he never told Birch about the contracts with Oorah (*id.* at 42:25–43:8), the commissions owed (*id.* at 47:8-15), or even the pendency of the lawsuit (*id.* at 45:6-13), and Birch, despite having done its due diligence in Tennessee, never learned of the pending litigation. While Kane Kessler refused to let Kuzon testify as to what other assets were being sold (*id.* at 71:24–72:3), or whether Covista would remain in business after the sale (*id.* at 49:20–52:21), it turned out that Covista sold everything to Birch *except its liabilities* and was out of business.

Oorah then joined Birch as a defendant in the State Action as Covista's successor-in-interest.  Basic due diligence undoubtedly would have disclosed Oorah's contract and the pending State Action.  Having learned of these things, it is not plausible to believe that Birch failed to

discuss with Covista the ramifications of rendering Covista insolvent while the State Action was pending.[9]  Instead, it retained Covista's counsel—Kane Kessler—to jointly represent them against Oorah in the State Action, thereby precluding a cross-claim for indemnity against Covista and, ethically, requiring that Kane Kessler disclose the conflict and obtain both Covista's and Birch's waiver of the same.  Clearly Birch, Covista and Kane Kessler had an agreement and understanding as to Oorah.

The State Court dismissed Birch, finding it did not meet the criteria for liability as a successor-in-interest, and the Appellate Division, affirmed by decision entered May 9, 2016. (Compl. ¶ 35.)  Prior to that dismissal, Oorah served Birch with its own discovery requests, directly alerting Birch to a fact its counsel already knew well: Oorah was seeking the data stored on the servers it bought from Covista but which, as of at least September 19, 2013, were still in Covista's possession.  (*See supra* p. 11.)  With everyone aware that Oorah was seeking data on the servers, and after the State Court ordered Covista to search them, Kane Kessler nevertheless permitted its client, Covista, to transfer those servers to its other client, Birch, and let Birch wipe the data that was subject to a court order to produce.  (*See supra* pp. 10-12.)  As a remedy, the State Court granted Oorah an adverse inference against Covista at trial.  (Compl. ¶ 52.)

C.   **The Final Gambit**

Over the course of the litigation, Kane Kessler had moved to withdraw as counsel twice, each time strategically grinding proceedings to a halt before withdrawing the motion.  (*See* Compl. ¶ 55.)  Once the Appellate Division dismissed Covista's counterclaim, Kane Kessler moved a third time, representing to the State Court by Order to Show Cause that it had been fired by Covista,

---

[9] Given Birch was aware that (1) it was acquiring all of Covista's assets, (2) leaving Covista with all of its liabilities, and (3) transferring a minimal amount of actual cash to Covista, Birch certainly understood the transaction would render Covista insolvent.

attaching an email from Kuzon to document it, and telling the State Court that its withdrawal should not be prejudicial because "an inquest is all that is necessary should Oorah decide to proceed with its claim[,]" (*See id.*; Declaration of Michael Furman, Esq. in Supp. of Fed. R. Civ. P. 12(b)(6) and (7) Mot. to Dismiss ("Furman Decl."), Ex. N at ¶ 8), since the State Court had already granted Oorah a judgment of liability on its breach of contract claim (Furman Decl. Ex. N at ¶ 6, 8). The State Court granted the motion, holding it had no discretion to deny the relief when the client had discharged its counsel. (Compl. ¶ 57.) Given the delays Covista had already caused, the State Court also ordered that Covista have replacement counsel appear in court on July 6, 2017. (*Id.*)

On that day, Kuzon appeared for Covista; the State Court refused to hear him because Kuzon was not admitted to the New York bar. (*Id.* ¶¶ 58-59.) Kuzon nevertheless proceeded to tell the State Court that Kane Kessler had lied in representing that he had fired them, and that Kane Kessler had instead refused to do any more work since they had agreed to be compensated on a contingency basis and no longer saw any upside to continuing once the counterclaim had been dismissed. (Compl. ¶ 59; Hail Decl. Ex. P at 5:3-17.) The State Court would certainly not have permitted Kane Kessler to withdraw for *that* reason—especially when, by Kane Kessler's own admission, all that remained was a simple damages hearing. But by coordinating such that Kuzon remained silent until Kane Kessler's motion was granted—even though Kuzon presumably had notice of their motion since the Order to Show Cause required it to be served on him—they managed to extricate Kane Kessler and obtain an excuse for further delay. (*See* Compl. ¶ 60.)

### D.   Resulting Damage

The plan developed and executed by Kane Kessler, Birch and Kuzon has been successful. Not only is Oorah is unable to collect on its existing $83,000 judgment against Covista, it will shortly face the same problem with respect to another, significantly larger, judgment. And due to

defendants' knowing misrepresentations and obstructionist tactics in the proceeding in which Oorah obtained that judgment, Oorah was forced to incur significant fees for the privilege.

*     *     *

These facts and the others, alleged in the Complaint with specificity (and fully supported by evidence as exemplified herein), certainly satisfy the test of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), which was itself a conspiracy case.  There, the allegations of conspiracy were held insufficient in an antitrust case because the only facts alleged to support the conspiracy were allegations of parallel conduct.  The Court noted that parallel conduct was not itself illegal, and occurs for a number of legitimate reasons in the absence of an illegal agreement.  Therefore, it held that "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Id.* at 556-57.  It thus held that "[a]n allegation of parallel conduct is thus much like a naked assertion of conspiracy in a §1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'"  *Id.* at 557 (citation omitted).  To state a conspiracy claim, the complaint was required to place such allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Id.*

Oorah's allegations certainly satisfy *Twombly*'s standard.  There is no need to consider whether it was "plausible" that there was an agreement to deprive Oorah of the commissions to which it was entitled, because there were actual agreements: Birch and Covista agreed to transfer all of Covista's customers who generated revenues for Oorah, during the litigation, without paying Oorah; Covista retained Kane Kessler and implemented a litigation strategy against Oorah; and Birch did likewise.  Indeed, there was necessarily a three-way agreement between Kane Kessler,

16

Covista and Birch in order for Kane Kessler to be able to represent them both simultaneously in the State Action, given the obvious conflict of interest stemming from the fact that Covista and Birch each had every reason to assert that the other was responsible for the amounts due to Oorah. In order for Birch and Covista to waive the conflict so that Kane Kessler could represent them both, they had to have agreed then—if they had not explicitly agreed earlier—that as between them, Covista remained responsible for the debt to Oorah even though, as a result of transferring its assets to Birch, it had no way to pay. And, as *Twombly* instructs, placing those agreements in the context of the other allegations, which include lies to the State Court, fake invoices, and coordination among the three of them that enabled Birch to destroy Covista's records, an agreement to harm Oorah that extends beyond any legitimate pursuit or defense of a claim is concretely alleged.

Furthermore the Complaint states claims for both actual and constructive fraudulent conveyance. "When inferring actual intent, courts rely on 'badges of fraud,' which include '(1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance.'" *Staudinger+Franke GMBH v. Casey*, No. 13 Cv. 6124(JGK), 2015 WL 3561409, at *14 (S.D.N.Y. June 8, 2015) (citing *Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477, 497 (S.D.N.Y. 2008)).   A plaintiff need not allege that all of the badges of fraud are present.  *See Staudinger+Franke GMBH*, 2015 WL 3561409 at *15 (denying summary judgment); *Topeover Corp. v. ENE Group LLC*, No. 12 CV 869(HB), 2013 WL 822378, at *2-3 (S.D.N.Y. March 6, 2013) (denying motion to dismiss).

17

Here, Oorah has clearly alleged at least four of these five badges.  First, Covista did not receive adequate consideration for the transfer of all of its assets.  (Compl. ¶ 36.)  Despite Kane Kessler's representation, made on behalf of both Birch and Covista, that "Covista had, well, $2.6 million *in cash* as an asset," received as proceeds of the asset sale (*id*. ¶ 34 (emphasis added)), Covista actually only ever received around $325,000 in cash (*id.* ¶ 36).

Second, Covista retained assets purchased by Birch as part of the transaction—namely, the servers from Covista's headquarters that would have contained data regarding the Covista customers acquired by Birch—for months after they had been "sold" to Birch.  (Compl. ¶ 42.) By virtue of Ms. Morgan's affidavit, it is clear that Covista retained those valuable assets for at least six months, through September 2013, and possibly as long as 21 months, through December 2014 (raising an unanswered question as to how Birch was able to service customers it acquired from Covista without the necessary customer records).  (*Id.*)

Third, the timing of the conveyances—both between Birch and Covista, and between Covista and the ultimate recipients of the cash received from Birch—is inherently suspicious, given that those conveyances (1) led to Birch's destruction of acquired assets (Covista's servers) that would have allowed Oorah to prove its damages in the State Action and (2) rendered Covista effectively judgment-proof in any event.  (*See* Compl. ¶¶ 37-44.)  Furthermore, as Covista and Birch were in the process of negotiating and effectuating that transfer, Kane Kessler actively obstructed Oorah's attempts to obtain discovery of the soon-to-be-destroyed records.  (*Id.*)

Fourth, it was clear that Covista would be—and was—rendered insolvent as a result of the transfer.  (Compl. ¶ 69-71.)  The transaction was intentionally structured such that Covista would retain all of its existing liabilities, none of its existing assets, and receive only $325,000 in cash, which could quickly be given to its principals and John Does.  (Compl. ¶¶ 3, 62, 68).  It is

inconceivable that sophisticated business entities would not have understood that this transaction would result in Covista's imminent insolvency.

## II.   EACH DEFENDANT IS ALLEGED TO HAVE DIRECTLY COMMITTED A WRONG IN FURTHERANCE OF THE CONSPIRACY

The conspiracy allegations render each defendant liable for the wrongs committed by the others, and each defendant is alleged to have committed at least one tort or statutory violation.

### A.   Kane Kessler Violated N.Y. Judiciary Law Section 487

Kane Kessler asserts that "the Complaint does not specify the exact nature of the KK Attorneys act of deceit or collusion necessary for a Judiciary Law § 487 [*sic*] but instead vaguely asserts bare conclusions," and that they were "forced to guess what possible 'misrepresentations' plaintiff accuses them of making to the Court in the underlying State Action, which are therefore insufficiently pleaded."  (KK Br. at 18.)  That assertion is belied by the Complaint Kane Kessler purports to be describing, which specifically describes numerous actionable misrepresentations by Kane Kessler during the course of the State Action, including:

- submitting the fake invoices to the Oorah and the State Court (Compl. ¶¶ 3(a), 17-21, 40, 48, 50);

- falsely stating that Covista had no New York presence (Compl. ¶¶ 3(d), 27-29);

- submitting Kuzon's affidavit to authenticate the fake invoices to support their cross-motion for summary judgment, knowing Kuzon had already sworn under oath that he could not authenticate them (Compl. ¶¶ 48-51);

- falsely and repeatedly stating that Covista had produced all responsive documents knowing that it could not be true if the fake invoices were based on actual records, because such records must have existed when those invoices were generated, just days before litigation commenced, and had never been produced in discovery (Compl. ¶ 41);

- falsely representing that they would comply with the State Court's order to have Covista electronically search its servers, instead permitting Covista to transfer those servers to Birch and letting Birch destroy all the data (Compl. ¶¶ 3(c), 20, 37, 44);

- falsely representing that Kuzon had fired them when Kuzon himself has explained that they in fact had quit (Compl. ¶¶ 55-60).

These misrepresentations are all identified with specificity in the Complaint, and certainly satisfy Fed. R. Civ. 9(b) to the extent that it applies.  Each of these misrepresentations is specifically identified and documented in correspondence, pleadings and briefs, and in court transcripts.  (*See supra* pp. 6-14.)  There is no ambiguity as to the who, what, and when.

Nor is there any question that the scienter allegations are more than sufficient.  A fraud claim must be supported by allegations that "give rise to a strong inference of fraudulent intent." *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996); *DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 372 (S.D.N.Y. 1999).  That requirement is satisfied by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *DIMON Inc.*, 48 F. Supp. 2d at 372.  Here, the allegations of Oorah's Complaint do not merely plausibly allege "motive and opportunity," or contain "strong circumstantial evidence," in many instances they cite facts which conclusively establish scienter beyond peradventure.  For example, it cannot be both that Kane Kessler believed the fake invoices to be legitimate, such that they were based upon actual customer data that must have existed when they were created just days before the litigation was filed, and that Kane Kessler believed that Covista actually had produced all responsive documents to Oorah when it necessarily knew that that customer data had never been produced.  Kane Kessler necessarily must have known *either* that the fake invoices were in fact illegitimate *or* that it was not true that Covista had produced all responsive documents when they were representing to the State Court that it had.  And Kane Kessler actually doubled down on the fraud, taking a personal stake in it by converting from an hourly to a contingent fee arrangement so that it would get paid only if the fraud was successful.

20

Thus, the allegations of the Complaint clearly satisfy the first three elements that Kane Kessler identifies as being necessary for a "deceit" claim under Judiciary Law section 487: "representation, falsity, scienter, deception and injury."  (KK Br. at 17 (footnote omitted).)  The fourth element they identify, "deception," is in fact not an element of a section 487 claim at all, at least not since the Court of Appeals' decision in *Amalfitano v. Rosenberg*, 903 N.E.2d 265, 268-69 (N.Y. 2009), where it specifically held that:

> The operative language [of the statute] at issue—"guilty of any deceit"—focuses on the attorney's intent to deceive, not the deceit's success…. Further, to limit forfeiture under section 487 to successful deceits would run counter to the statute's evident intent to enforce an attorney's special obligation to protect the integrity of the courts and foster their truth-seeking function.

*See also Melcher v. Greenberg Traurig LLP*, 24 N.Y.S.3d 249, 255 (1st Dep't 2016) ("A plaintiff may bring an action to recover damages for attorney deceit regardless of whether the attorney's deceit was successful.").  The reason actual deception is unnecessary is because, in the context of litigation, misrepresentations have consequences in terms of additional cost and delay, even if no one is actually deceived.  *See Melcher*, 135 A.D.3d at 552 (approving recovery of treble damages where party commenced an action based on a material misrepresentation of fact, obligating opposing party to incur legal expenses to defend against it).

That is what is alleged to have occurred here.  Kane Kessler submitted the fake invoices and then moved for summary judgment on the basis of evidence it knew to be incompetent, initially deceiving the trial court but not the Appellate Division, and costing Oorah not only substantial time and attorneys' fees, but over $80,000 to bond Covista's illegitimate judgment until it was reversed.  Those costs—including the attorneys' fees and cost of the bond—are exactly the type of damages that are recognized and recoverable on a section 487 claim.  *Id.* ("the plaintiff in a section 487 case may recover the legal expenses incurred as a proximate result of a material

misrepresentation in a prior action"); *see also Amalfitano v. Rosenberg*, 428 F. Supp. 2d 196, 211-12 (S.D.N.Y. 2006) (awarding treble the amount of attorneys' fees and costs incurred by plaintiff "from onset of litigation, through the appeal, and on remand"), *aff'd Amalfitano v. Rosenberg*, 533 F.3d 117 (2d Cir. 2008), *certifying questions to Amalfitano*, 903 N.E.2d 265 (N.Y. 2009).

Oorah's Complaint pleads a "deceit" claim under section 487 insofar as it satisfies all of the elements Kane Kessler identifies.  In fact, it even pleads a "pattern of legal delinquency" by identifying multiple instances of such deceit, commencing from the very inception of litigation until Kane Kessler ended its participation by withdrawing based on representations its own client has identified to be false.[10]

That leaves only Kane Kessler's arguments that this claim should have been asserted in the State Action and is barred by collateral estoppel.  Both arguments are tied to the same misconception, namely, that Oorah is using the section 487 claim to collaterally attack the judgment in the State Action.  It is in no way attacking the State Action, after all, it *won* in the State Action (it already has an $80,000 judgment, a judgment of liability on its remaining claim, and Covista's counterclaim has been dismissed).  Oorah is not seeking to relitigate anything decided in the State Action, and to the extent that collateral estoppel applies at all, Oorah will be pleased to rely on the various findings of that Court—such as the finding that Kane Kessler's representation as to Covista having no presence in New York was "false."  And because the section 487 claim does not collaterally attack the State Action, the claim does not have to be asserted in

---

[10] New York's Appellate Divisions disagree on whether a "chronic, extreme pattern of legal delinquency" is required to support a claim under section 487, and New York's highest court has not addressed the split.  *Compare Schindler v. Issler & Schrage, P.C.*, 692 N.Y.S.2d 361, 362-63 (1st Dep't 1999) *with Izko Sportswear Co. v. Flaum*, 809 N.Y.S.2d 119, 122 (2d Dep't 2006).  The Second Circuit has recognized that such a requirement "appears nowhere in the text of the statute."  *Amalfitano*, 533 F.3d at 123-24.  As noted in *Trepel v. Dippold*, "[t]he phrase…was apparently coined by *Wiggins v. Attorney Anonymous*, 115 Misc. 2d 1071, 1077 (N.Y. City Civ. Ct. 1982), and has been repeated without analysis since that time." 2005 WL 1107010 at *4, n.5 (S.D.N.Y. May 9, 2005) (rejecting such a requirement). *Accord Polanco v. NCO Portfolio Management, Inc.*, 23 F. Supp. 3d 363, 374-75 (S.D.N.Y. 2014).

that action and Oorah was free to bring it in any court with jurisdiction. *Melcher*, 135 A.D.3d at 554 ("[plaintiff] does not, in fact, seek by this action to collaterally attack any prior adverse judgment or order on the ground that it was procured by fraud…. Instead, plaintiff here seeks to recover lost time value of money and the excess legal expenses incurred in the [prior] action as a proximate result of defendants' alleged deceit; this course of action is permissible in a separate action under the Judiciary Law."); *see also Amalfitano*, 903 N.E.2d 8 (N.Y. 2009) (same); *Canon U.S.A., Inc. v. Divinium Techs., Inc.*, 2017 WL 696693 at *3 (S.D.N.Y. Feb. 21, 2017) (same).

Similarly, Birch's assertion that the claim is barred by *res judicata* because "it could have been brought" in the State Action misstates the law. (Def. Birch Commc'ns Inc.'s Mem. of Law in Supp. of Its Mot. to Dismiss All Claims Against Birch ("Birch Br.") at 7-9.) *Res judicata* only bars claims that "should have been brought" at the time the action was commenced, and thus does not bar claims that could have been asserted in the action but which did not arise until after the action was filed. *See, e.g.*, *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 919 (2d Cir. 2010) ("Claim preclusion does not bar claims, even between identical parties, that arise after the commencement of the prior action."); *Legani v. Alitalia Linee Aeree Italiane, S.p.A.*, 400 F.3d 139, 141 (2d Cir. 2005) ("As a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play." (internal quotation marks omitted)). "Where the facts that have accumulated after the first action are enough on their own to sustain the second action, the new facts clearly constitute a new 'claim,' and the second action is not barred by *res judicata.*" *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 384 (2d Cir. 2003). "The crucial date" for this analysis "is the date the complaint was filed." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir.2000). *See also Indosuez Int'l Finance, B.V. v. Nat'l Reserve Bank*, 758 N.Y.S.2d 308, 310 (1st Dep't 2003) (rejecting argument that

claims were barred by *res judicata* when "the gravamen of the wrongs claimed here could not have been raised at the earlier juncture because defendant's [acts] occurred after the first action was instituted, and, indeed, some of defendant's objectionable conduct occurred after the motion court granted summary judgment"); *Apostolic Faith Rescue Mission v. Slipyan*, 89 N.Y.S.2d 721, 722 (N.Y. App. Term, 2d Dep't 1949) (no merit to *res judicata* defense where proceeding based on a change in circumstances occurring "subsequent to the commencement of the prior suits").

The section 487 claim could not have asserted when the State Action was filed for the obvious reason that the claim could not arise until after the action had been commenced. *See, e.g.*, *Costalas v. Amalfitano*, 760 N.Y.S.2d 422, 424 (1st Dep't 2003) (section 487 only applies to conduct in connection with a pending lawsuit). Birch's *res judicata* argument fails for the additional reasons that Kane Kessler was not a party to the State Action and, as Birch itself acknowledges, the section 487 claim could not have been asserted against any of the parties to that action because the claim is cognizable only against attorneys. (*See* Birch Br. at 10.)[11]

B.  **The Fraudulent Conveyance Claims**

By reason of the conspiracy, a fraudulent conveyance by any member will render them all liable, but neither Kane Kessler nor Birch disputes that Kuzon or the other non-moving defendants participated in such fraudulent conveyances. Each discusses the claim only as to themselves and Oorah does so as well. Both argue that the claim is barred by the statute of limitations and inadequately pleaded. Oorah will address each contention in turn.

---

[11] In fact, the very State Court before which that Action is pending has elsewhere disallowed assertion of a section 487 claim as part of the same action in which the attorneys alleged to have committed the violation represented a named party. In affirming, the Appellate Division agreed that allowing the claim could be prejudicial such that denial of leave to amend a complaint was appropriate. *360 W. 11th LLC v. ACG Credit Co. II, LLC*, 90 A.D.3d 552, 553 (1st Dep't 2011) (affirming Order of Bransten, J., and holding that rule that "a lawyer shall not act as advocate before a tribunal in an [*sic*] matter in which the lawyer is likely to be a witness on a significant issue of fact" mitigated against allowing section 487 claim to be asserted in the pending action).

1.      <u>The Claims Are Not Time-Barred Under CPLR Section 202</u>

Defendants argue that Oorah is a New Jersey resident for purposes of CPLR section 202, which requires application of the shorter four-year New Jersey statute of limitations rather than the longer six-year New York statute applicable to fraudulent transfer claims, and "[b]ecause Birch's purchase of specific assets from Covista occurred [in March 2013] more than four years before the filing of the instant complaint, (Compl. ¶ 33) any fraudulent conveyance claim is time-barred—this claim could only have been brought, at the latest, in March 2017."   (Birch Br. at 13.)

Two fraudulent conveyance claims are pleaded: actual and/or constructive fraud (Second Cause of Action) and under NY Debtor & Creditor Law Section 273-a (Third Cause of Action). Although defendants argue that New York's borrowing statute, CPLR section 202, renders both claims untimely without differentiation, the proper analysis is different for each and both are in fact timely.

a.      *NY Debt. & Cred. Law Section 273-a*

A claim under New York Debtor and Creditor Law section 273-a does not accrue at the time of transfer, as defendants assume, but when the plaintiff becomes a judgment creditor. *Coyle v. Lefkowitz*, 934 N.Y.S.2d 216, 219 (2d Dep't 2011) ("the six-year limitations period for [a constructive fraud cause of action pursuant to Debtor and Creditor Law section 273-a] begins to run on the date of entry of the judgment") (internal citation omitted); *see Setters v. AI Props. & Devs. (USA) Corp.*, 32 N.Y.S.3d 87, 89-90 (1st Dep't 2016).  Oorah obtained its judgment on June 7, 2017 and filed this action on September 20, 2017.  Therefore, the claim is timely even under CPLR section 202 even applying the four-year statute of limitations.

b.      *Other Fraudulent Conveyances*

Other fraudulent conveyance claims do generally accrue at the time of the transfer, as defendants assert, but defendants' arguments again depend upon the incorrect accrual date and overlook the doctrine of equitable tolling.[12]

While defendants assume that the accrual date is March 2013, simply because that is when the Birch-Covista transaction "closed," the facts alleged demonstrate otherwise.  But first it is important to identify the "fraudulent conveyance" at issue.  Oorah has alleged a scheme consisting of:

1.  Covista's transfer of all of its assets to Birch—including Oorah's customers but not the attendant liabilities—which "closed" in March 2013 (Compl. ¶ 33);

2.  without "fair consideration" (Compl. ¶¶ 67-68, 75);

3.  followed by Covista's transfer(s) of such sums, again without fair consideration, to others including Kuzon, Kane Kessler and the John Doe defendants (Compl. ¶¶ 70-72, 75);

4.  leaving Covista judgment-proof (Compl. ¶¶ 54, 69-70).

While Birch seems to think that only items #1 and 2 concern it, and Kane Kessler similarly thinks that only items #3 and 4 concern it, that is not the law.  "It is well-established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under [New York's Uniform Fraudulent Conveyance Act]."  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).  Indeed, the specific holding of the Second Circuit is that these transactions can be collapsed even if item #2 were not true—in other words, Birch would still be liable for the damage caused at the conclusion of the second transaction in which it was not involved (items #3 and #4), if it had given fair value and the transaction consisting of

_____

[12] Both Birch and Kane Kessler have assumed that New York law applies to the fraudulent transfer claims.  Oorah agrees to the application of New York law to those claims, especially as Debtor and Creditor Law section 273-a regulates conduct concerning litigation in New York courts and clearly implements a compelling state interest.

items #1 and #2, by itself, was not fraudulent at all—as we discuss below when we move beyond the statute of limitations.  (*See infra* pp. 29-33.)

Viewed as a single transaction, however, the injury would not have occurred, and Oorah's claim will not have accrued, until the completion of items #3 and #4, when Covista was rendered insolvent through the dissipation of what it received from Birch in the transaction that closed on March 26, 2013.  There, the trail grows interesting.  As alleged in the Complaint (¶ 34), "on April 29, 2014, Schiano-Strain appeared for ***both*** Birch and Covista to argue that it was perfectly reasonable to [dismiss Birch and] leave all the liabilities with Covista because it 'still exists' and 'Covista had, well, $2.6 million in cash [received as the proceeds of the asset sale to Birch] as an asset.  It's not like Covista just is defunct and is no longer around; it has assets.  They're still litigating this lawsuit.'"  (Hail Decl. Ex. R at 6:24-25; 8:7-10.)  That assertion was accepted by the State Court in granting Birch's motion to be dismissed "[b]ecause according to Birch, Birch is not—Birch and Covista were selling and buying etcetera; and Covista did get, according to Mr. Schiano-Strain, a payment of more than 2 million—two and a half million—dollars, which would go to Birch acquiring assets of Covista."  (*Id.* at 13:6-17.)  Based on the assertion by Kane Kessler that the State Court accepted—and the allegation credited as it must be on a motion to dismiss— then items #3 and #4 had not occurred as of April 2014 and this action, commenced on September 20, 2017, was brought well within even a four-year statute of limitations.

At the same time, there is reason to doubt that Schiano-Strain was telling the truth when he represented to the State Court that Covista ever had "$2.6 million in cash" as a result of the sale to Birch.  Oorah obtained in discovery a closing statement that included wire transfer instructions showing that Covista had received, at most, just $325,750.00 in cash from the Birch transaction when it closed on March 26, 2013, with all other funds going elsewhere—*including back to Birch.*

(*See* Hail Decl. Ex. Q.)  Therefore, if Kane Kessler was telling the truth, there is no statute of limitations issue.  If they were not telling the truth, then it is one more data point supporting both the section 487 claim and the conspiracy allegations because Schiano-Strain was agent of both Covista and Birch, acting within the actual scope of his actual authority, when he made that representation on their behalves in open court.  Based on what is before the Court on this motion to dismiss, it cannot be said that the Complaint fails to plausibly state a claim within the statute of limitations.

That is true for the additional reason that Kane Kessler's statement—even if false—would judicially estop both Birch and Kane Kessler from now claiming that the transfer occurred earlier in order to invoke the statute of limitations.  Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position taken by that party in a prior legal proceeding."  *Clark v. Advanced Composites Grp.*, 16 Civ. 6422 (GBD), 2017 WL 2266981, at *4 (S.D.N.Y. Apr. 28, 2017) (citing *Robinson v. Concerta Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015)).  It must be demonstrated that "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some matter, such as by rendering a favorable judgment."  *Clark*, 2017 WL 2266981, at *4.

That is precisely what occurred when the State Court dismissed Birch on the strength of Schiano-Strain's representations that items #3 and #4 had not occurred as of April 2014; judicial estoppel will prevent them from now contending otherwise to take advantage of the statute of limitations. Their prior statement did not have to be the "but for" cause of Birch's dismissal; it is sufficient for judicial estoppel that "the party's former position has been adopted *in some way* by the court in the earlier proceeding." *Lia v. Saporito*, 541 F. App'x 71, 74 (2d Cir. 2013) quoting

28

*Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust),* 634 F.3d 678, 695-96 (2d Cir. 2011) (emphasis added; internal quotation marks omitted).

        2.    <u>The Claims Are Well-Pleaded</u>

           *a.*    *As To Birch*

Birch argues that it was improper to plead that the transactions were "both actually and constructively fraudulent as to Oorah" and that it should have been pleaded as two separate claims. (Birch Br. at 16-18.)  We fail to understand that argument insofar as a constructive fraud overlaps an actual fraud when the scienter allegations are considered, and alternative pleading is acceptable. But if the Court deems it necessary, Oorah will amend its Complaint to assert two separate causes of action and respectfully seeks leave to do so.  Nevertheless, the assertion that the allegations do not give adequate notice under Rule 8, and are not specific enough in pleading actual fraud to comply with Rule 9(b) (*id*. at 18), is belied by the allegations themselves, as discussed in more detail in connection with the conspiracy.  (*Supra* pp. 6-14.)

The only specific "fault" Birch purports to identify is that the Complaint "acknowledges that Birch paid $4 million for the assets from Covista" but supposedly makes "no allegation as to why or how this was not fair consideration."  (Birch Br. at 19-20.)  That is simply incorrect.

New York's fraudulent conveyance law uses the term "fair consideration" in the statutes relevant here, Debtor and Creditor Law section 273-a (discussed above) and sections 273, 274, 275 (constructively fraudulent transfers), and it is defined in section 272 as follows:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not

> disproportionately small as compared with the value of the property, or obligation obtained.

As it concerns antecedent debt, the statute has one important exception: "preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration." *HBE Leasing*, 48 F.3d at 634.  And the statutory requirement that the transfer be "in good faith" is independent of the measure of value, such that "fair consideration" is not present even when "fair equivalent" or "not disproportionately small" value was given, but not in "good faith." *Id*. at 636.[13]  *HBE Leasing* directly explains how these principles interplay with the facts alleged here to state a claim against Birch, even if the $4 million it supposedly paid Covista was, in fact, exactly what those assets were worth.  Before turning to that, however, we note that the facts alleged do explain "why or how this was not fair consideration" and certainly render it plausible that Birch did not in fact give a "fair equivalent" from a purely economic standpoint.

As Birch notes, the Complaint specifically alleges that the "sale price" to Birch was nominally $4 million (Compl. ¶ 33), but Birch fails to note that the Complaint also alleges that number to be wholly illusory: "Covista had received a net amount of less than $325,000 from Birch, with the balance of the $4,000,000 'purchase price' going elsewhere, including approximately $1.7 million credited to Birch at closing."  (Compl. ¶ 36.)  That allegation is documented, as discussed above in connection with Kane Kessler's contrary assertion that Covista received $2.6 million cash and was still operating in April 2014.  (*See supra* pp. 27-28 and Hail Decl. Ex. Q at 8:7-10.)  But even if receiving $325,000 for assets Birch is contending to have been worth $4 million is somehow a "fair equivalent," *HBE Leasing* explains why, under the

---

[13] "A party seeking to set aside a conveyance on the basis of lack of good faith must prove one of the following factors is lacking: "(1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others."  *Staudinger+Franke GMBH v. Casey*, No. 13 CV. 6124 JGK, 2015 WL 3561409, at *10 (S.D.N.Y. June 8, 2015) (citing *Southern Indus. v. Jeremias,* 411 N.Y.S.2d 945, 949 (2d Dep't 1978)).

Complaint's allegations (as outlined in the four points, *supra* p. 26), a fraudulent conveyance claim would still be stated against Birch.

In *HBE Leasing*, the Second Circuit explained that it was appropriate to collapse separate transactions in the "paradigmatic scheme" where: "one transferee [Birch] gives fair value to the debtor [Covista] in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee [here, Kuzon and the other officers or shareholders who are the John Doe defendants, and others]. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing." 48 F.3d at 635.  That is exactly what is alleged here.  The Court went on to explain that "[u]nder these circumstances, the initial transfer of the debtor's property to the first transferee is constructively fraudulent if two conditions are satisfied":

> First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors. If, instead, the debtor retains the proceeds from the first exchange, reconveys them for fair consideration, or uses them for some other legitimate purpose, including the preferential repayment of pre-existing debts, and if the debtor does not make the subsequent transfer with actual fraudulent intent, then the entire transaction, even if "collapsed," cannot be a fraudulent conveyance, because it does not adversely affect the debtor's ability to meet its overall obligations.

*Id.*  That condition is met in that the Complaint alleges that the proceeds of the sale to Birch went to Kuzon and other officers, directors and shareholders for whom even antecedent debts would not constitute "fair consideration" as a matter of law.  *See id.* at 634, quoted *supra* p. 30.[14]  That brings us to the Second Circuit's second condition.

---

[14] Likewise, the attorneys' fees received by Kane Kessler would not be paid in exchange for "fair consideration" given the allegations discussed in connection with the conspiracy which plausibly allege actual participation in the fraudulent scheme, not merely the required "constructive knowledge."  *See id*. at 636, 640.

"Second, …the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent." *Id.* at 635. *HBE Leasing* again demonstrates that Oorah's Complaint is sufficient, because even viewed most charitably to Birch—without, of course, waiving the rule that a complaint's allegations are to be read in Oorah's favor—the Second Circuit made it clear that a claim would be stated against Birch.

In that case, the party in Birch's position was named "Clemence" and, while she was a former director of the judgment debtor, "Enterprises," she was no longer a director when she granted Enterprises two mortgages in 1992, or by the time it became a judgment debtor in 1994. *Id.* at 629-30, 637.  In both mortgages, Clemence advanced her own funds and received notes and mortgages in the same amounts she had advanced.  *Id.* at 630.   Nevertheless, the Court held that her mortgages were voidable if she had actual or constructive knowledge of the scheme, and it held almost exactly the same allegations Oorah makes against Birch to be sufficient to establish such knowledge:

> Clemence concedes that she knew that Enterprises was a defendant in a RICO fraud action. She also concedes that she knew that her son, Hiram J. Frank, had made "large loans" to Enterprises, which put her on notice that he might cause the company to make preferential payments to himself with the proceeds from the mortgages. This information should have been sufficient to alert Clemence to the danger that Enterprises might improperly funnel to third parties the money she was advancing, and she should have made reasonably diligent inquiries into the use of the mortgage proceeds. Under the circumstances, her failure to inquire represented a conscious turning away from the subject. Thus, with regard to both mortgages, the undisputed facts are sufficient to charge Clemence with constructive knowledge of schemes in which her cash advances were expended by Enterprises for improper purposes.

*Id.* at 637.  As noted above, it is inherently implausible that Birch would enter into what it has claimed to be a $4 million transaction without learning about the State Action during its due

diligence—or that it would not have questioned how Covista would satisfy its undisclosed liabilities when it was purporting to receive, at most, $325,750.00 from the transaction that would leave it without any assets and necessarily put it out of business.  And it is certainly curious that Birch would nonchalantly waive the right to seek indemnity from Covista and agree to retain Kane Kessler when it got sued in an action that Covista supposedly never told it about, then wantonly destroy the very evidence it and its lawyers knew Oorah was seeking in discovery.

"Actual fraudulent intent must be proven by clear and convincing evidence, but it may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."  *HBE Leasing*, 48 F.3d at 639. All of those elements are specifically alleged; the Complaint adequately alleges Birch had "actual or constructive knowledge" of Covista's fraudulent intent and therefore did not give "fair consideration" under *HBE Leasing* even if it did not have actual fraudulent intent itself and did give economically equivalent consideration.

Finally, Birch argues that *res judicata* precludes the fraudulent conveyance claims because they could have been asserted in the State Action.  (Birch Br. at 6-10.)  That is plainly not true with respect to the Third Cause of Action under Debtor & Creditor Law section 273-a which, as noted above, could not have been brought before Oorah had become a judgment creditor.  (*Supra* p. 25.)  Nor is it true of the other fraudulent conveyance claims because, as also discussed above, all are dependent upon additional acts that had not occurred at the time the Complaint was filed and, therefore, are not part of the "same transaction or occurrence" for *res judicata* purposes and are not barred if not raised in the same complaint.  (*See supra* pp. 26-29.)[15]

---

[15] The same would be true as of the time of filing the Second Amended Complaint naming Birch as a defendant—at that time, Birch had not yet elected to retain Kane Kessler to defend it, necessitating its agreement to waive conflicts with Covista, had not yet been the beneficiary of Kane Kessler's false statements, and had not yet taken possession

The only claims asserted against Birch in the State Action were for breach of Covista's contract with Oorah on the now-rejected theory that it became Covista's successor-in-interest. (*See* Furman Decl. Ex. A at ¶¶ 40-46, 51-56.)  To the extent that the State Court and Appellate Division both found that fraud had not been pleaded sufficiently to give rise to successor liability, that determination on a CPLR 3211 motion to dismiss merely determined whether the pleading was sufficient, not whether there actually had been a fraudulent scheme.  The decision itself was not on the merits as would be necessary to give rise to *res judicata* or collateral estoppel.  *See* CPLR § 5013 ("A judgment dismissing a cause of action before the close of the proponent's evidence is not a dismissal on the merits unless it specifies otherwise").  It is not true that the Appellate Division "determined that [the sale to Birch] was not a fraudulent transaction" as Kane Kessler asserts. (KK Br. at 19.)  The Appellate Division made no such "determination," it merely held that the complaint did not state a cause of action for successor liability based on fraud because it failed to allege the *non-fraud-based facts* that would still be required to find liability on that theory, including recent formation of Birch; overlapping owners or executives; or similar domicile and residence.  *Oorah, Inc. v. Covista Commc'ns, Inc.*, 30 N.Y.S.3d 626 (1st Dep't 2016).

### b.    As to Kane Kessler

Kane Kessler makes the same *res judicata* and statute of limitations arguments as Birch (KK Br. at 19-20) and which should be rejected for the same reasons (*see supra* pp. 23-24 & n. 11).

Additionally, Kane Kessler argues that it is not the recipient of any fraudulent conveyance and that such claims may not be asserted against those who were neither transferees or

---

of, or wiped, Covista's server while that server was the subject of a court order.  Nor, according to Kane Kessler, had the scheme to render Covista judgment-proof been completed.

beneficiaries.  (KK Br. at 19 (citing *Federal Deposit Ins. Cor. v. Porco*, 552 N.Y.S.2d 910, 911 (1990).)  Kane Kessler, however, was both.

As discussed above, under New York law,[16] Kane Kessler can be liable as a transferee even to the extent that it provided legal services of reasonably equivalent value to what it was paid—if it had actual knowledge of the fraud.  Such knowledge is adequately pleaded here.  It is also at least plausible to expect that Kane Kessler was being paid, as it represented parties in the State Action.  In that case, Kane Kessler was the actual recipient of fraudulent transfers.

More importantly, Kane Kessler is alleged to be party to a common-law conspiracy that sought to defraud Oorah (and, in the process, the State Court), not merely by effectuating fraudulent transfers to defeat Oorah's ability to enforce its judgment, but by destroying evidence so that Oorah would not be able to receive the judgment to which it was entitled in the first place, and by manufacturing fake invoices so that Covista could obtain a fraudulent judgment <u>against</u> Oorah.  Obviously, Kane Kessler was benefitting from its participation in the conspiracy, both by generating fees and by securing for itself a stake Covista's later-overturned $2,617,362.13 judgment.  Nothing in *Porco* or anything else cited by Kane Kessler changes the rule that all coconspirators are jointly liable for the damages caused by any of them.[17]

---

[16] At this juncture, the Court need not decide whether the conspiracy allegations are governed by New York or New Jersey law, because both recognize that a conspirator can be liable for a fraudulent transfer effectuated by another. *E.g., Banco Popular North America v. Gandi*, 876 A.2d 253 (N.J. 2003) (conspiracy to commit fraudulent transfer under New Jersey law); *In re Allou Distributors, Inc.*, 379 B.R. 5, 36 (Bankr. E.D.N.Y. 2007) ("courts in this Circuit have similarly recognized that a claim for conspiracy to commit a fraudulent conveyance may be stated under New York law.").

[17] *Porco* merely held that that "there is [no] merit to [the] argument that section 273-a of the Debtor and Creditor Law (L.1962, ch. 310, § 103) created a creditor's cause of action in conspiracy, assertable against nontransferees or nonbeneficiaries solely for assisting in the conveyance of a debtor's assets."  75 N.Y.2d at 841.  No one is advancing that argument here.

### C.    **Breach of Fiduciary Duty: Aiding and Abetting**

While Birch and Kane Kessler did not owe fiduciary duties of their own to Oorah, both recognize that they can be liable as aiders and abetters for the breaches of others when they (1) had knowledge of the breach, and (2) rendered substantial assistance to the breaching fiduciary (KK Br. at 23; Birch Br. at 20).  The Complaint alleges numerous such incidents, but we herein focus on one incident involving both Kane Kessler and Birch: the destruction of Covista's records.

As explained in the Complaint, under the parties' agreement, "Covista had sole control of all the customer records upon which Oorah's commission depended[.]" (Compl. ¶¶ 2, 14; *see also* Hail Decl. Ex S at ¶ 5.)  Under New York law, a commercial contract will give rise to fiduciary duties where, as here, "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." *Staudinger+Franke GMBH v. Casey,* No. 13 CV. 6124 JGK, 2015 WL 3561409, at *12 (S.D.N.Y. June 8, 2015), quoting *Calvin Klein Trademark Trust v. Wachner,* 123 F. Supp. 2d 731, 733-34 (S.D.N.Y.2000).

In the State Action, Oorah alleged that Covista had breached that duty both by failing to make full and accurate disclosure of those records and by altering them to fraudulently under-report the commissions it owed Oorah.  (Compl. ¶ 16.)  Oorah voluntarily dismissed that claim in the State Action because the damages it could obtain would be duplicative of those it would obtain for its breach of contract claim, for which it already had a liability judgment against Covista.  Thus, there was no point in complicating, and hence delaying, the proceedings when Covista had already shown itself unable to satisfy any judgment Oorah would obtain anyway.

On September 19, 2013, Kane Kessler (as counsel for both Birch and Covista) represented to the State Court that Covista's customer records were on servers that had been sold to Birch, but still in Covista's possession and retrievable by Covista, and on December 20, 2013, the State Court

ordered them searched.  Almost a year later, on December 9, 2014, Kane Kessler reported to the State Court that the servers were never searched.  Instead, Covista had transferred the servers to Birch, and Birch destroyed all records on them.  (Compl. ¶¶ 37-43.)  Destruction of those records was a separate and distinct breach of fiduciary duty by Covista, occurring sometime between September 19, 2013 and December 9, 2014, that would not have occurred without the substantial assistance of Birch (in actually wiping the servers) and Kane Kessler (in lying to the State Court so the servers could be transferred and destroyed by Birch, then concealed until Birch was dismissed from the State Action).[18]   *See Cromer Fin. Ltd. v. Berger,* 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) ("The 'substantial assistance' requirement of the third prong exists 'where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.'" (internal quotations and citation omitted)).  And neither Birch nor Kane Kessler can deny knowledge that they were assisting with a breach of Covista's duty because they were attorney and client in the very action where Oorah had already alleged that Covista breached its fiduciary duty in merely failing to disclose those records.  The damage this caused Oorah is obvious from the Complaint: it destroyed Oorah's ability to prove its damages, it delayed Oorah's ability to obtain relief from Covista until after Covista was rendered judgment-proof and, of course, it caused Oorah to incur additional attorneys' fees.

The Complaint lays out at least that one example of aiding and abetting a breach of fiduciary duty that could not be more specifically alleged in accordance with Rule 9(b), which accrued no earlier than December 9, 2014.  It is thus timely even under the shorter three-year

---

[18] The obligation to disclose the customer records obviously encompasses an obligation not to destroy them, but the actual destruction of the records was of a wholly different character than Covista's prior breaches of fiduciary in refusing to disclose them.

statute of limitations both Birch and Kane Kessler contend to be applicable under CPLR section 202. (KK Br. at 22; Birch Br. at 14.)[19]  The Complaint states a claim against each of them.

## III.   COVISTA IS NEITHER NECESSARY NOR INDISPENSIBLE

Kane Kessler argues that Covista is a necessary and indispensable party solely on the basis that the "Complaint itself directly implicates Covista." (KK Br. at 24.)  That is not enough.

"It is not enough under [Fed. R. Civ. P.] Rule 19(a)(2)(i) for a third party to have an interest, even a very strong interest, in the litigation. Nor is it enough for a third party to be adversely affected by the outcome of the litigation. Rather, necessary parties under Rule 19(a)(2)(i) are only those parties whose ability to protect their interests would be impaired *because of* that party's absence from the litigation." *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.,* 471 F.3d 377, 387 (2d Cir. 2006) (emphasis in original). Thus, "it is well-established that under federal law, neither joint tortfeasors nor co-conspirators are indispensable parties." *Frink America, Inc. v. Champion Road Machinery Ltd*., 961 F. Supp. 398, 405 (N.D.N.Y. 1997). "There is, moreover, no requirement that a plaintiff name as parties-defendants all co-conspirators as long as their existence is set forth in the complaint." *Eye Encounter, Inc. v. Contour Art, Ltd*., 81 F.R.D. 683, 689 (E.D.N.Y. 1979). *See also Trugman-Nash, Inc. v. New Zealand Dairy Bd*., 942 F. Supp. 905, 917 (S.D.N.Y. 1996*), on reargument sub nom. Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Prod. Holdings (N. Am.) Inc*., 954 F. Supp. 733 (S.D.N.Y. 1997). Similarly, "[i]t has long

---

[19]  Birch and Kane Kessler cannot argue that they actually destroyed the records any earlier because they were each under a duty to disclose and preserve those records, as parties and attorneys in the litigation, and their fraudulent concealment would toll the statute to that date anyway. *See Fuqua v. Bristol-Myers Squibb Co.*, 926 F. Supp. 2d 538, 548 (D.N.J. 2013) ("generally under New Jersey law, active fraudulent concealment of a cause of action tolls the running of the statute of limitations until plaintiff discovers the wrong or has reasonable notice of it" (collecting cases)). This type of concealment—"affirmative, independent effort to conceal the events or circumstances surrounding the underlying cause of action"—acts to toll the statute. *Fuqua*, 926 F. Supp. 2d at 548 (applying New Jersey law).

been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp. Ltd.,* 498 U.S. 5, 8 (1990).

Kane Kessler does not argue that it, or existing parties, are prejudiced in any way by Covista's absence.  They articulate no reason why Oorah should have to undertake the burden and expense of litigating another claim against Covista, when the very reason Oorah was compelled to seek relief in this action was because, through defendants' efforts, Covista was rendered judgment-proof.  Instead, they argue only that "Plaintiff's allegation against the KK Attorneys' conduct necessarily implicates Covista's conduct during the State Action and, as a consequence, any judgment against the KK attorneys will prejudice Covista."  (KK Br. at 25.)  While such "prejudice" is dubious, and in any event not cognizable under Rule 19,[20] the short and dispositive answer is that Kane Kessler has no standing to raise Covista's interests because "[a] party named in the litigation cannot assert the interest on the absent party's behalf." *Chang Young Bak v. Metro-N. R. Co.*, No. 12 CV 3220, 2013 WL 1248581, at *5 (S.D.N.Y. Mar. 26, 2013), quoting *Cont'l Cas. Co. v. Am. Home. Assur. Co.*, 2008 WL 1752231, at *4.

---

[20] Kane Kessler seems to be suggesting that the "prejudice" to Covista will result from the collateral estoppel effect of unspecified determinations that might be made, not that there will be any determination of the rights and obligations of Covista itself.  That is not a cognizable "interest" under Rule 19.  *E.g., Chang Young Bak,* 2013 WL 1248581, at *5.  Moreover, inasmuch as Covista is not a party, it will not be bound to any rulings made in this case, unless it is deemed to be in privity with one or more of the defendants, in which case it would cut *against* Covista being deemed a necessary party.  *E.g., Cont'l Cas. Co. v. Am. Home Assur. Co.*, No. 05 CIV 7874 LTS JCF, 2008 WL 1752231, at *4 (S.D.N.Y. Apr. 14, 2008) ("When an identity of interest exists between two parties, and one of the parties will sufficiently represent those interests, the other party is not necessary to the litigation."); *Polargrid LLC v. Videsh Sanchar Nigam Ltd.*, No. 04 CV 9578(TPG), 2006 WL 2266351, at *10 (S.D.N.Y. Aug. 7, 2006) (same).

**CONCLUSION**

For the foregoing reasons, Oorah respectfully requests that both the Birch and Kane

Kessler motions to dismiss be denied in all respects, together with such other and further relief as

this Court deems just and proper.


Dated: New York, New York                    STORCH AMINI PC
        December 22, 2017


                                             By:  _S/_ Steven G. Storch _____
                                                 Steven G. Storch
                                                 Casey J. Hail
                                             2 Grand Central Tower
                                             140 East 45th Street, 25th Floor
                                             New York, NY 10017
                                             (212) 490-4100
                                             sstorch@storchamini.com
                                             chail@storchamini.com

                                             *Attorneys for Plaintiff Oorah, Inc.*